Danielle DiMauro (*pro hac vice*)
Rebecca W. Watson (Wyoming Bar No. 5-1683)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
1401 Lawrence Street, Suite 1800
Denver, Colorado 80202
Telephone: 303-830-2500
Facsimile: 303-832-2366
rwatson@wsmtlaw.com
ddimauro@wsmtlaw.com

Hampton O'Neill (Wyoming Bar No. 5-2876)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
159 North Wolcott, Suite 220
Casper, Wyoming 82601
Telephone: 307-234-6907
Facsimile: 307-234-6908
honeill@wsmtlaw.com

*Attorneys for Petitioner*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| PONDEROSA RESOURCES CORPORATION, ) ) Petitioner, ) ) v. ) ) THE UNITED STATES BUREAU OF LAND ) MANAGEMENT, ANDREW ARCHULETA, in ) his official capacity as Wyoming State Director for) the U.S. Bureau of Land Management, and ) THE UNITED STATES DEPARTMENT ) OF THE INTERIOR, ) ) Respondents. ) ) | Civil Case No. 1:24-cv-00141-SWS |

## FIRST AMENDED PETITION FOR REVIEW OF FINAL AGENCY ACTION

**INTRODUCTION**

Petitioner Ponderosa Resources Corporation ("Ponderosa") respectfully submits this petition for review of government action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA") and Local Civil Rule 83.6.  Ponderosa is a small, privately held company that offers consulting services to entities undertaking oil and gas exploration and development projects.  In the past, Ponderosa also owned and operated a single oil and gas lease.  That lease, Federal Oil and Gas Lease WYW140314 ("Lease" or "Lease WYW140314"), covering 280 acres of public land in Fremont County, Wyoming, was issued by the U.S. Bureau of Land Management ("BLM").  Ponderosa owned operating rights and a share of record title in the Lease from 1997 until 2011, when it assigned and transferred its remaining interests to another company.  The Lease contained a single oil and gas well, the Day Butte 1-17 well ("Day Butte well"), which produced oil and gas until 2014.  Ponderosa no longer holds any record title interest or operating rights in the Lease.  Nevertheless, citing its own regulation and current policy, BLM directed Ponderosa to plug and abandon the Day Butte well, and reclaim associated surface disturbance.

BLM has estimated the cost for this work to exceed $300,000.  Ponderosa does not have sufficient funds to undertake the well-plugging, abandonment, and reclamation work required by BLM, and therefore has not complied with BLM's orders.  As a result, BLM has instituted enforcement actions against Ponderosa, including demanding $800,580.00 in civil penalties from the company.

BLM's regulation imposing liability for well plugging and abandonment on past lessees and operating rights owners, 43 C.F.R. § 3106.72(b)[1] (like its precursor, 43 C.F.R. § 3106.7–

---

[1] BLM recently promulgated new oil and gas leasing regulations, effective June 22, 2024.  *See* Fluid Mineral Leases and Leasing Process, 89 Fed. Reg. 30916 (April 23, 2024).

2(b)) does not comport with the directive of Congress in Section 187a of the Mineral Leasing Act of 1920, 30 U.S.C. §187a.  Accordingly, 43 C.F.R. § 3106.72(b) (2024) and 43 C.F.R. § 3106.7–2(b) (2023) are contrary to law, and BLM's application of either version of the regulation to impose liability on Ponderosa is arbitrary and capricious.  BLM's imposition of continuing liability on Ponderosa after the transfer of its interests also is inconsistent with 43 C.F.R. § 3106.7-6(a).  Moreover, BLM's adjudication of Ponderosa's civil penalty liability violates the Seventh Amendment to the U.S. Constitution.  This Court should vacate the regulation and BLM's enforcement orders and notices to Ponderosa, and enjoin Respondents from pursuing enforcement action against Ponderosa in connection with plugging and abandonment of the Day Butte well or reclamation of the associated surface disturbance.

## JURISDICTION AND VENUE

1.      This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

2.      Venue is proper in this District under 28 U.S.C. § 1391(b) and (e) because the public lands that are the subject of the action are located in this District, and a substantial part of the events giving rise to this action occurred in this District.

3.      The United States has waived its sovereign immunity under the APA.

## PARTIES

4.      Petitioner Ponderosa Resources Corporation is a Colorado corporation in good standing.

5.      Respondent U.S. Bureau of Land Management ("BLM") is an agency within the U.S. Department of the Interior.  The Secretary of the Interior ("Secretary") has delegated to BLM responsibility for managing federal public lands, including federal mineral resources, as defined by the Federal Land Policy and Management Act, 43 U.S.C. § 1702(e).

6.      Respondent U.S. Department of the Interior is a Cabinet-level agency of the United States government responsible for administering federal land and mineral resources.

7.      Respondent Andrew Archuleta is the Wyoming State Director for the Bureau of Land Management and is named in his official capacity.

## FACTUAL ALLEGATIONS RELATING TO THE GROUNDS ON WHICH THE AGENCY ACTIONS ARE BEING CHALLENGED

### Statutory, Regulatory, and Policy Framework

8.      The APA authorizes reviewing courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.

9.      The APA, in 5 U.S.C. § 706(2), directs reviewing courts to:

hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]

10.     The Mineral Leasing Act, 30 U.S.C. § 187, provides in pertinent part:

No lease issued under the authority of this chapter shall be assigned or sublet, except with the consent of the Secretary of the Interior. The lessee may, in the discretion of the Secretary of the Interior, be permitted at any time to make written relinquishment of all rights under such a lease, and upon acceptance thereof be thereby relieved of all future obligations under said lease . . . .

11.     The Mineral Leasing Act, 30 U.S.C. § 187a, provides in pertinent part:

Notwithstanding anything to the contrary in section 187 of this title, any oil or gas lease issued under the authority of this chapter may be assigned or subleased, as to all or part of the acreage included therein, subject to final approval by the Secretary and as to either a divided or undivided interest therein, to any person or persons qualified to own a lease under this chapter, and any assignment or sublease shall take effect as of the first day of the lease month following the date of filing in the proper land office of three original executed counterparts thereof,

4

together with any required bond and proof of the qualification under this chapter of the assignee or sublessee to take or hold such lease or interest therein. Until such approval, however, the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed. . . .

Requests for approval of assignment or sublease shall be processed promptly by the Secretary. Except where the assignment or sublease is not in accordance with applicable law, the approval shall be given within 60 days of the date of receipt by the Secretary of a request for such approval. Upon approval of any assignment or sublease, the assignee or sublessee shall be bound by the terms of the lease to the same extent as if such assignee or sublessee were the original lessee, any conditions in the assignment or sublease to the contrary notwithstanding. Any partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands; and such segregated leases shall continue in full force and effect for the primary term of the original lease, but for not less than two years after the date of discovery of oil or gas in paying quantities upon any other segregated portion of the lands originally subject to such lease. . . .

12. The Mineral Leasing Act, 30 U.S.C. § 189 (2024), authorizes the Secretary of the Interior "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes" of Title 30, Chapter 3A—Leases and Prospecting Permits.

13. BLM's regulation at 43 C.F.R. § 3100.5 defines "record title" as

a lessee's interest in a lease, which includes the obligation to pay rent and the ability to assign and relinquish the lease. Record title includes the obligation to comply with the lease terms, including requirements relating to well operations and abandonment. Overriding royalty and operating rights are severable from record title interests.

14. BLM's regulation at 43 C.F.R. § 3100.5 defines "lessee" as "a person holding record title in a lease issued by the United States."

15. BLM's regulation at 43 C.F.R. § 3100.5 defines "operating right (working interest)" as:

5

the interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations, including production of oil or gas from such lands in accordance with the terms of the lease. Operating rights include the obligation to comply with the terms of the original lease, as it applies to the area or horizons for the interest acquired, including the responsibility to plug and abandon all wells that are no longer capable of producing, reclaim the lease site, and remedy environmental problems.

16.     BLM's regulation at 43 C.F.R. § 3100.5 defines "operating rights owner" as "a person holding operating rights in a lease issued by the United States. A lessee also may be an operating rights owner if the operating rights in a lease or portion thereof have not been severed from record title."

17.     BLM's regulation at 43 C.F.R. § 3100.5 defines "assignment" as a transfer of all or a portion of the lessee's record title interest in a lease.

18.     BLM's regulation at 43 C.F.R. § 3100.5 defines "sublease" as:

a transfer of a non-record title interest in a lease, i.e., a transfer of operating rights is normally a sublease, and a sublease also is a subsidiary arrangement between the lessee (sublessor) and the sublessee, but a sublease does not include a transfer of a purely financial interest, such as overriding royalty interest or payment out of production, nor does it affect the relationship imposed by a lease between the lessee(s) and the United States.

19.     BLM's regulation at 43 C.F.R. § 3100.5 defines "transfer" as "any conveyance of an interest in a lease by assignment, sublease or otherwise. This definition includes the terms: Assignment and Sublease."

20.     BLM's regulation at 43 C.F.R. § 3106.7–2 (2023) ("If I transfer my lease, what is my continuing obligation?") provided:

(a) You are responsible for performing all obligations under the lease until the date BLM approves an assignment of your record title interest or transfer of your operating rights.

(b) After BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer. This includes

6

paying compensatory royalties for drainage. It also includes responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer.

21.     When promulgating 43 C.F.R. § 3106.7-2, BLM stated:

Some commenters suggested that the original lessee or operator should not be responsible for plugging and abandoning when control and all obligations have been conveyed to other parties. The final rule did not adopt this suggestion. While we first look to the current lessee for lease compliance, we believe it prudent to reserve our rights against all parties who had the potential to benefit from the well's existence.

66 Fed. Reg. 1883, 1890 (Jan. 10, 2001).

22.     BLM's regulation at 43 C.F.R. § 3106.72 (2024) ("Continuing obligation of an assignor or transferor") provides:

(a) The lessee or sublessee remains responsible for performing all obligations under the lease until the date the BLM approves an assignment of record title interest or transfer of operating rights.

(b) After the BLM approves the assignment or transfer, the assignor or transferor will continue to be responsible for lease obligations that accrued before the approval date, whether or not such obligations were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells drilled and removing facilities installed or used before the effective date of the assignment or transfer.

23.     When promulgating 43 C.F.R. § 3106.72, BLM stated:

The BLM has revised this paragraph in the final rule to clarify the obligations of the assignor or transferor once the BLM approves an assignment or transfer. . . . The assignor or transferor will continue to be responsible for other lease obligations, not limited to the items enumerated in § 3106.72(b).

89 Fed. Reg. 30916, 30942 (April 23, 2024).

24.     BLM's regulation at 43 C.F.R. § 3106.7-6 (2023) ("If I acquire a lease by an assignment or transfer, what obligations do I agree to assume?") provided:

(a) If you acquire record title interest in a Federal lease, you agree to comply with the terms of the original lease during your lease tenure. You assume the responsibility to plug and abandon all wells which are no longer capable of

7

producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time. You must also maintain an adequate bond to ensure performance of these responsibilities.

(b) If you acquire operating rights in a Federal lease, you agree to comply with the terms of the original lease as it applies to the area or horizons in which you acquired rights. You must plug and abandon all unplugged wells, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time you receive the transfer. You must also maintain an adequate bond to ensure performance of these responsibilities.

25.    BLM's regulation at 43 C.F.R. § 3106.76 (2024) provides:

(a) The assignee of record title agrees to comply with the terms of the original lease during the lease tenure. The assignee assumes the responsibility to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known existed at the time of the transfer. When required, the record title holder must also maintain an adequate bond to ensure performance of these responsibilities.

(b) The transferee of operating rights agrees to comply with the terms of the original lease as it applies to the area or horizons for the interest acquired. The transferee assumes the responsibility to plug and abandon all wells that are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known existed at the time of the transfer. When required, the operating rights holder must also maintain an adequate bond to ensure performance of these responsibilities.

26.    Instruction Memorandum 2021-039, entitled "Orphaned Well Identification, Prioritization, and Plugging and Reclamation" ("IM 2021-039"), sets forth BLM's policy and guidance for the identification and prioritization of orphaned wells.  IM 2021-039 states that it "provides guidance to the [BLM] Field Offices (FOs) concerning the process BLM will use to identify potential orphaned wells, pursue liable parties, seek funding to permanently plug and abandon, and reclaim (also defined as remediate) identified orphaned wells."

27. IM 2021-039 states:

Legally liable parties for surface disturbance for a well that is located on a Federal or Indian oil and gas lease include the current operator, the current Record Title Owner(s) of the lease (RTO), the current Operating Rights Holder(s) (ORH), and all previous RTOs and ORHs that held an interest in the lease since the surface disturbance occurred or the well was drilled.

28. Attachment 1 to IM 2021-039 directs BLM to seek performance of lease obligations by the current operator, the current Record Title Owners, and the current Operating Rights Holders; but if those parties do not comply, "BLM must issue a bill for collections to the previous RTOs and ORHs when the obligation is more than the operator's bond, and add the owners and their officers to the [Mineral Leasing Act] 17(g) List per 30 U.S.C. § 226(g) and 43 C.F.R. § 3102.5-1(f)."

29. The Tenth Circuit Court of Appeals has held that the language of 30 U.S.C. § 187a of the Mineral Leasing Act is "ambiguous" as to whether an assignment or transfer of record title or operating rights in a lease "releases the assignor/sublessor, or whether the assignee/sublessee becomes jointly liable with the assignor/sublessor." *Monahan v. U.S. Department of the Interior*, No. 05-8068, 2007 WL 2993577 *4 (10th Cir., Oct. 15, 2007).

30. In *Monahan*, the Tenth Circuit observed that if a record title holder who had transferred only a sublease (*i.e.*, a transfer of operating rights) had instead "satisfied his lease obligations and made a written relinquishment of his lease, he would have been 'released of all obligations thereafter accruing.'" *Id.*, 2007 WL 2993577 *4.

31. In *Monahan*, the Tenth Circuit concluded that a sublease did not affect the ongoing obligations of the current record title holder to the U.S. Government under the terms of the lease. *Id.* (citing the definition of "sublease" in 43 C.F.R. § 3100.0-5(e) (2001)).

32.     On June 28, 2024, the United States Supreme Court decided *Loper Bright Enterprises v. Raimondo*, 2024 WL 3208360 (2024).  In that case, the court overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and held "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. . . . [C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."

33.     On July 1, 2024, the United States Supreme Court decided *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. ---, 144 S. Ct. 2440 (2024).  In that case, the Court held that an "APA claim does not accrue for purposes of [28 U.S.C] § 2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action."  *Id.* at 2460.

### *Factual Background*

34.     On information and belief, the land on which the Day Butte well is located was once part of Federal Oil and Gas Lease WYW56314 ("Lease WYW56314"), which was issued in 1976.

35.     On information and belief, the Day Butte well was constructed in 1986.

36.     On information and belief, Lease WYW56314 terminated in 1996 due to the cessation of production of oil and gas.

37.     BLM leased lands that include the Day Butte well to Swanson & Morris LLC ("Swanson & Morris") under the terms of Lease WYW140314, effective December 1, 1996.

38.     Swanson & Morris assigned 100% of its record title interest and operating rights in Lease WYW140314 to Ponderosa in 1997.  BLM approved this assignment.

39. Ponderosa transferred 100% of the operating rights in Lease WYW140314 to Equinox Resources LLC ("Equinox").  BLM approved this transfer, effective May 1, 2011.  After the effective date of BLM's approval, Ponderosa retained no operating rights in the Lease.

40. Ponderosa assigned 50% of the record title interest in Lease WYW140314 to Swanson & Morris LLC.  BLM approved this assignment, effective August 1, 2000.

41. Ponderosa assigned 17.5% record title interest in Lease WYW140314 to Bauer OG LLC.  BLM approved this assignment, effective May 1, 2007.

42. Ponderosa assigned its remaining 32.5% record title interest in Lease WYW140314 to Equinox.  BLM approved the assignment, effective July 1, 2011.  After the effective date of BLM's approval, thirteen years ago, Ponderosa retained no record title interest in the Lease.

43. On information and belief, BLM subsequently approved the assignment by Equinox of 100% record title interest in Lease WYW140314 to Adcore Acquisition Group ("Adcore").

44. On information and belief, beginning July 1, 2011, Adcore held 100% record title and 100% operating rights in Lease WYW140314.

45. On information and belief, the Day Butte well continued production of oil and gas until at least 2014.

46. On information and belief, BLM determined in 2018 that the Day Butte well had ceased production.

47. On information and belief, Lease WYW140314 expired on October 14, 2018.

48. On information and belief, the status of Lease WYW140314 in BLM's records is "closed."

11

49.    In a Notice of Orders of the BLM Authorized Officer dated December 1, 2023 (Written Order No. 24SPG0001W), the BLM Lander Field Office informed Ponderosa that Adcore, as well as the current operator, Wind River Hydrocarbons,[2] had not responded to BLM's requests for compliance.

50.    In Written Order No. 24SPG0001W, BLM ordered Ponderosa, as a former record title and operating rights holder, to submit a Notice of Intent to plug and abandon the well by January 8, 2024.  BLM cited 43 C.F.R. § 3106.7-2(b) (2023) as authority for the order.

51.    In an e-mail dated December 27, 2023, Sebastien Guinard, Petroleum Engineer at the Lander Field Office, confirmed an extension of Ponderosa's compliance period until February 8, 2024.

52.    On January 29, 2024, Ponderosa requested that the Respondent BLM Wyoming State Director exercise the discretion afforded by 43 C.F.R.  §§ 3163.1(c) and 3163.2(g) to compromise BLM's assessment and civil penalties associated with Ponderosa's failure to submit a notice of intent to plug and abandon the Day Butte well as directed in Written Order No. 24SPG0001W.

53.    In a response letter dated March 1, 2024, BLM explained that because it had not yet issued any civil penalties or assessments in the enforcement action, Ponderosa's request was "moot."

54.    On February 15, 2024, Ponderosa received BLM's Notice of Incidents of Noncompliance ("INC") No. 24SPG0001I, related to its failure to comply with Written Order No. 24SPG0001W.

---

[2] Although not specifically stated in Written Order No. 24SPG0001W, it appears that while Wind River Hydrocarbons was the operator, it was not an "operating rights owner" as defined in 43 C.F.R. § 3100.5, as it does not appear in the "Master List" of record title owners and operating rights holders attached to the Written Order, or in the adjudication summary provided to Ponderosa by BLM.

55. On March 12, 2024, Ponderosa submitted a request for State Director Review ("SDR") of INC No. 24SPG0001I pursuant to 43 C.F.R. § 3165.3(b). Ponderosa requested that the Respondent State Director, as part of his review of the INC, exercise his discretion pursuant to 43 C.F.R. §§ 3163.1(c) and 3163.2(g) to compromise the BLM's assessment and civil penalties associated with the INC, given the inequity of BLM's application of 43 C.F.R. § 3106.7-2 to require Ponderosa to plug and abandon the well. Ponderosa also requested that the Respondent State Director stay the accrual of assessments and penalties during his review, as authorized by 43 C.F.R. §3163.1(e)(1).

56. On March 15, 2024, Ponderosa received from BLM a second INC, No. 24SPG0001A, with a $250 assessment pursuant to 43 C.F.R. § 3163.1(a)(2), and an accompanying Notice of Proposed Civil Penalties ("Penalty Notice"), related to its failure to comply with Written Order No. 24SPG0001W.

57. On March 15, 2024, Ponderosa also received from BLM a "Bill Summary" for Bill No. 2024024989 in the amount of $250 along with payment instructions.

58. On March 19, 2024, BLM notified Ponderosa that it had granted "a stay of all enforcement actions and a stay of any attempt to seek the associated assessment and [civil penalties]." The BLM notice indicated that Ponderosa's request for review of INC No. 24SPG0001I by the State Director had been designated SDR No. WY-2024-010. Ponderosa received this notice on March 22, 2024.

59. On April 10, 2024, the BLM Wyoming Branch Chief for Fluid Minerals Operations informed counsel for Ponderosa that "SDR-2024-10 is currently in queue but may take a few weeks to process. Currently, it is estimated with low confidence to be completed on or about the end of May or early-June."

13

60.     On April 10, 2024, Ponderosa submitted a request for SDR of INC No. 24SPG0001A and the accompanying Penalty Notice that it had received on March 15, 2024.

61.     On April 22, 2024, Ponderosa received, through U.S. Mail to Ponderosa's counsel, a BLM decision for SDR WY-2024-014 dated April 18, 2024.  SDR WY-2024-014 concerned INC No. 24SPG0001A.

62.     BLM's decision in SDR WY-2024-014 affirmed INC No. 24SPG0001A based on the conclusion that INC No. 24SPG0001A "was issued by the [Lander Field Office] prior to Ponderosa's request for SDR on INC 24SPG0001I and is therefore valid."

63.     On June 26, 2024, counsel for Ponderosa sent an email to the BLM Wyoming Branch Chief for Fluid Minerals Operations and an attorney at the Office of the Solicitor to inquire about the status of SDR WY-2024-010 and request an updated estimate as to when the review might be completed.

### Final Agency Actions

64.     On June 27, 2024, the Branch Chief responded by email, and attached a copy of a decision in SDR WY-2024-010 dated April 18, 2024.  The Branch Chief also attached a U.S. Mail electronic tracking record asserting delivery on April 22, 2024, to 1401 Lawrence Street, Denver, CO 80202—the building where the offices of Ponderosa's counsel are located.  BLM did not request that the U.S. Post Office obtain a signature to confirm delivery, and the tracking record did not include a signature showing receipt by counsel's offices in Suite 1800.

65.     The decision was not delivered to counsel's offices in Suite 1800.  Ponderosa first learned of the decision in SDR WY-2024-010 on June 27, 2024.

66.     BLM's decision in SDR WY-2024-010 stated that during the period in which the Day Butte well had been productive ("682 days of total production over 18 years from lease

14

issuance in December 1996 through last recorded production in May 2014"), Ponderosa "not only had record title interest from 1997 to 2011, but also held operating rights from 1997-2014."

67.     BLM incorrectly stated in the decision in SDR WY-2024-010 that Ponderosa held operating rights in the Lease until 2014. Ponderosa transferred 100% of its operating rights in Lease 140314 to Equinox Resources LLC in 2011 and held no operating rights in the Lease thereafter.

68.     In SDR WY-2024-010, the BLM Wyoming Deputy State Director for Minerals and Lands, exercising the delegated authority of the Respondent State Director, affirmed INC No. 24SPG0001I based on the conclusion that "[a]s a previous record title owner of lease WYW140314, Ponderosa is responsible to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence in accordance with 43 CFR § 3106.7-6(a)."

69.     Unlike Written Order No. 24SPG0001W, the decision in SDR WY-2024-010 cited 43 C.F.R. § 3106.7-6(a) (2023), pertaining to the responsibilities of subsequent record title owners.

70.     The decision in SDR WY-2024-010 did not acknowledge or respond to Ponderosa's request that the Respondent State Director compromise the BLM's assessment and civil penalties pursuant to 43 C.F.R. §§ 3163.1(c) and 3163.2(g).

71.     The decision in SDR WY-2024-010 is a final agency action.

72.     On July 1, 2024, Ponderosa received an order from BLM dated June 27, 2024, entitled "Civil Penalties" informing Ponderosa that "the full civil penalty amount" of $800,580.00 was due and payable. The order stated that Ponderosa had the right to seek review of the order by the State Director.

15

73.     The "Civil Penalties" order dated June 27, 2024, is a final agency action.

74.     On July 1, 2024, Ponderosa also received a Bill for Collection from BLM in the amount of $800,580.00.

75.     On July 19, 2024, Ponderosa received a "First Demand Letter" from BLM, dated July 15, 2024, seeking payment of Bill No. 2024024989 for the $250.00 assessment associated with the second INC (No. 24SPG0001A), plus a penalty and administrative handling charge, for a total of $273.68.

76.     On August 10, 2024, Ponderosa received a "Second Demand Letter" from BLM, dated August 7, 2024, seeking payment of Bill No. 2024024989 for the $250.00 assessment associated with the second INC (No. 24SPG0001A), plus a penalty and administrative handling charge, for a total of $290.28.

77.     The Second Demand Letter dated August 7, 2024, is a final agency action.

**CLAIM 1:**
**43 C.F.R. § 3106.72(b) (2024) AND 43 C.F.R. § 3106.7-2(b) (2023)**
**ARE CONTRARY TO LAW (5 U.S.C. § 706)**

78.     Ponderosa reasserts and incorporates by reference the preceding paragraphs.

79.     Section 187a of the Mineral Leasing Act specifies that any assignment or sublease of interests in a federal oil and gas lease is subject to final approval by the Secretary.

80.     Section 187a of the Mineral Leasing Act specifies that until the Secretary approves an assignment or sublease of an interest in a federal oil and gas lease, the assignor or sublessor "shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed."

81.     Section 187a of the Mineral Leasing Act specifies that "[a]ny partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided,

release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands."

82.    Section 187a of the Mineral Leasing Act does not impose on an assignor or transferor responsibility for the performance of lease obligations that arise after the Secretary's approval of an assignment or sublease.

83.    There is no obligation to plug and abandon a well while it continues to produce oil and gas on an active lease.

84.    The responsibility to plug and abandon a well and reclaim the well site arises after the well ceases production.

85.    BLM's regulation at 43 C.F.R. § 3106.72(b) (2024), like the precursor regulation at 43 C.F.R. § 3106.7-2(b) (2023), provides that after the Secretary, through BLM, approves an assignment or transfer, "the assignor or transferor will continue to be responsible for lease obligations that accrued before the approval date whether or not such obligations were identified at the time of the assignment or transfer."  The regulation further defines such lease obligations that "accrued before the approval date" to include "responsibility for plugging wells drilled and removing facilities installed or used before the effective date of the assignment or transfer."

86.    BLM's interpretation of 30 U.S.C. § 187a to impose on an assignor or transferor responsibility for plugging and abandoning a well that continued production after the approval date, as reflected in 43 C.F.R. § 3106.72(b) (2024) and the precursor regulation at 43 C.F.R. § 3106.7-2(b) (2023), is not consistent with the statute.

87.    Because they do not comport with the statute, BLM's regulation at 43 C.F.R. § 3106.72(b) (2024) and the precursor regulation at 43 C.F.R. § 3106.7-2(b) (2023) exceed the

"statutory jurisdiction, authority, or limitations, or [are] short of statutory right," granted to the Secretary by Congress in 30 U.S.C. § 187a.  *See* 5 U.S.C. § 706(2).

88.    BLM's promulgation of 43 C.F.R. § 3106.72(b) (2024) and the precursor regulation, 43 C.F.R. § 3106.7-2(b) (2023), is contrary to law.

**CLAIM 2:**
**APPLICATION OF 43 C.F.R. § 3106.7-2(b) AND 43 C.F.R. § 43 C.F.R. § 3106.7-6(a) (2023) TO PONDEROSA RESOURCES CORPORATION IS ARBITRARY AND CAPRICIOUS (5 U.S.C. § 706)**

89.    Ponderosa reasserts and incorporates by reference the preceding paragraphs.

90.    Section 187a of the Mineral Leasing Act specifies that any assignment or sublease of interests in a federal oil and gas lease is subject to final approval by the Secretary.

91.    Section 187a of the Mineral Leasing Act specifies that until the Secretary approves an assignment or sublease of an interest in a federal oil and gas lease, the assignor or sublessor "shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed."

92.    Section 187a of the Mineral Leasing Act specifies that "[a]ny partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands."

93.    Section 187a of the Mineral Leasing Act does not impose on an assignor or transferor responsibility for the performance of lease obligations that arise after the Secretary's approval of an assignment or sublease.

94.    BLM's regulation at 43 C.F.R. § 3106.72(b) (2024), like the precursor regulation at 43 C.F.R. § 3106.7-2(b) (2023), provides that after the Secretary, through BLM, approves an assignment or transfer, "the assignor or transferor will continue to be responsible for lease

18

obligations that accrued before the approval date whether or not such obligations were identified at the time of the assignment or transfer." The regulation further defines such lease obligations that "accrued before the approval date" to include "responsibility for plugging wells drilled and removing facilities installed or used before the effective date of the assignment or transfer."

95.    BLM's regulation at 43 C.F.R. § 3106.76(a) (2024), like the precursor regulation at 43 C.F.R. § 3106.7-6(a) (2023), provides that an "assignee of record title agrees to comply with the terms of the original lease during the lease tenure," and assumes "the responsibility to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should have known existed at the time of the transfer." This regulation only describes the responsibilities assumed by an assignee of record title interest in a federal lease. The regulation does not identify continuing responsibility of an assignee that subsequently assigns its record title interest to others.

96.    Ponderosa made partial assignments of its record title interest to other entities in 2000, 2007, and 2011.

97.    Ponderosa retained no operating rights or record title interest in Lease 140314 after July 1, 2011.

98.    The Day Butte well continued production of oil and gas until at least 2014.

99.    BLM's application of 43 C.F.R. § 3106.7-2(b) (2023) to find that responsibility for plugging and abandoning the Day Butte well accrued before the date of the Secretary's approval of Ponderosa's assignment of its remaining record title interest to Equinox is arbitrary and capricious.

100.    BLM's application of 43 C.F.R. § 3106.7-2(b) to impose on Ponderosa responsibility for plugging and abandoning the Day Butte well, which continued production after the date of approval of the assignment of Ponderosa's remaining record title interest to Equinox, is arbitrary and capricious.

101.    BLM's conclusion that even after the Secretary approved the transfers of all of Ponderosa's interests, Ponderosa bears continuing responsibility for plugging and abandoning the Day Butte well, reclaiming the "lease site," and remedying "all environmental problems in existence and that a purchaser exercising reasonable diligence should have known at the time" does not comport with the plain language of 43 C.F.R. § 3106.7-6 (2023) or Section 187a of the Mineral Leasing Act, and is therefore arbitrary and capricious.

102.    BLM's reliance on 43 C.F.R. §§ 3106.7-2(b) to hold Ponderosa liable for civil penalties in the amount of $800,580.00 under 43 C.F.R. § 3163.2 and assessments and fees in the amount of $273.68 under 43 C.F.R. § 3163.1(a)(2) is arbitrary and capricious.

## CLAIM 3:
## BLM'S ADJUDICATION OF PONDEROSA'S PENALTY LIABILITY VIOLATED THE SEVENTH AMENDMENT TO THE U.S. CONSTITUTION
## (U.S. Const. Amend. VII)

103.    Ponderosa reasserts and incorporates by reference the preceding paragraphs.

104.    The Seventh Amendment to the U.S. Constitution provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

105.    BLM seeks civil penalties from Ponderosa in the amount of $800,580.00.

106.    The civil penalties sought by BLM are a form of monetary relief.

107.    The civil penalties sought by BLM are designed to punish or deter wrongdoing.

20

108.    Civil penalties are "a type of remedy at common law that could only be enforced in courts of law." *Securities and Exchange Comm'n v. Jarkesy*, 2024 WL 3187811 *8, 144 S. Ct. 2117, 2129 (2024) (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)).

109.    The civil penalties sought by BLM do not "restore the status quo." *Id.* (quoting *Tull*, 481 U.S. at 422).

110.    The Seventh Amendment to the U.S. Constitution entitles Ponderosa to a jury trial on BLM's demand for civil penalties.

111.    BLM's adjudication of Ponderosa's penalty liability violates the Seventh Amendment to the U.S. Constitution and is therefore unlawful.

## PRAYER FOR RELIEF

Ponderosa respectfully requests that the Court grant the following relief:

1.    Declare that 43 C.F.R. § 3106.72(b) (2024) and its precursor, 43 C.F.R. § 3106.7–2(b) (2023), violate the APA because they are in excess of statutory jurisdiction, authority, or limitations and therefore unlawful;

2.    Vacate and set aside 43 C.F.R. § 3106.72(b) (2024) and its precursor, 43 C.F.R. § 3106.7–2(b) (2023).

3.    Declare that BLM's application of 43 C.F.R. § 3106.72(b) (2024) and its precursor, 43 C.F.R. § 3106.7–2(b) (2023), to Ponderosa, violates the APA and is unlawful because it is in excess of statutory jurisdiction, authority, or limitations and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

4.    Declare that BLM's application of 43 C.F.R. § 3106.76(a) (2024) and its precursor, 43 C.F.R. § 3106.7–6(a) (2023), to Ponderosa, violates the APA and is unlawful

21

because it is in excess of statutory jurisdiction, authority, or limitations and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

5.    Vacate and set aside BLM's enforcement orders and notices to Ponderosa related to the Day Butte well.

6.    Declare that Ponderosa has no responsibility to plug and abandon the Day Butte well or reclaim the associated surface disturbance.

7.    Declare that BLM's imposition of civil penalties against Ponderosa for purported noncompliance with orders issued pursuant to 43 C.F.R. § 3106.72(b) (2024) and its precursor, 43 C.F.R. § 3106.7–2(b) (2023), violates the APA and is unlawful because it is in excess of statutory jurisdiction, authority, or limitations; is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and is without observance of procedure required by law.

8.    Declare that BLM's charge of an assessment against Ponderosa for purported noncompliance with orders issued pursuant to 43 C.F.R. § 3106.72(b) (2024) and its precursor, 43 C.F.R. § 3106.7–2(b) (2023), violates the APA and is unlawful because it is in excess of statutory jurisdiction, authority, or limitations and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

9.    Declare that Ponderosa has no liability for civil penalties or assessments in connection with BLM's orders involving the Day Butte well.

10.   Declare that BLM's adjudication of Ponderosa's civil penalty liability was unlawful because it violated the Seventh Amendment to the U.S. Constitution and therefore was contrary to constitutional right, power, privilege, or immunity, and without observance of procedure required by law.

11.   Vacate and set aside BLM's adjudication of Ponderosa's civil penalty liability.

22

12. Preliminarily and permanently enjoin Respondents from pursuing further enforcement action against Ponderosa in connection with the Day Butte well.

13. Award Ponderosa all costs and attorneys' fees available under 28 U.S.C. § 2412 and other applicable law.

14. Grant such other relief, in law and in equity, to which Ponderosa may be entitled.

Respectfully submitted this 14th day of August, 2024.

*/s/ Danielle DiMauro*

Danielle DiMauro (*pro hac vice*)
Rebecca W. Watson (Wyoming Bar No. 5-1683)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
1401 Lawrence Street, Suite 1800
Denver, Colorado 80202
Telephone: 303-830-2500
Facsimile: 303-832-2366
rwatson@wsmtlaw.com
ddimauro@wsmtlaw.com

Hampton O'Neill (Wyoming Bar No. 5-2876)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
159 North Wolcott, Suite 220
Casper, Wyoming 82601
Telephone: 307-234-6907
Facsimile: 307-234-6908
honeill@wsmtlaw.com

*Attorneys for Petitioner Ponderosa Resources Corporation*