ADAM R.F. GUSTAFON
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division
U.S. Department of Justice
MICHAEL S. SAWYER
Senior Attorney, Natural Resources Section
michael.sawyer@usdoj.gov

DARIN D. SMITH
United States Attorney
C. LEVI MARTIN (WY Bar #6-3781)
Civil Chief
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
christopher.martin@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| PONDEROSA RESOURCES CORPORATION,<br><br>Petitioner,<br><br>v.<br><br>THE UNITED STATES BUREAU OF LAND MANAGEMENT, ANDREW ARCHULETA, in his official capacity as Wyoming State Director for the U.S. Bureau of Land Management, and THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Respondents,<br><br>&<br><br>WESTERN ORGANIZATION OF RESOURCE COUNCILS, CENTER FOR BIOLOGICAL DIVERSITY, and WILDEARTH GUARDIANS,<br><br>Intervenor-Respondents. | Civil Case No. 1:24-cv-00141-SWS |

**FEDERAL RESPONDENTS' OPPOSITION TO PETITIONERS' OPENING BRIEF**

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................1

BACKGROUND ....................................................................................2

I. LEGAL BACKGROUND....................................................................2

A. Under Common Law, Oil & Gas Assignments Do Not Release Assignors From Lease Obligations ..............................2

B. The Mineral Leasing Act Did Not Change The Common Law....................................................................................4

C. BLM's Regulatory Implementation Of Continuing Responsibility Did Not Change The Common Law...................7

D. Congress Has Authorized BLM To Enforce Lease Requirements Through Appropriate Remedies ........................12

II. FACTUAL BACKGROUND .........................................................13

A. Day Butte Well History .........................................................13

B. BLM Orders Concerning the Day Butte Well .........................17

STANDARD OF REVIEW ......................................................................21

ARGUMENT ........................................................................................23

I. MANY OF PONDEROSA'S CLAIMS ARE TIME BARRED.........23

A. Ponderosa Cannot Challenge Most Well-Specific Decisions ....................................................................................23

B. Ponderosa Cannot Circumvent The Mineral Leasing Act's Statute Of Limitations By Facially Challenging 43 C.F.R. § 3106.7-2(b)...................................................................27

II. PONDEROSA'S CHALLENGE TO 43 C.F.R. § 3106.7-2(b) FAILS.............................................................................................29

A. Abandonment Obligations Accrue With Each Well................29

B. Congress Did Not Completely Release Assignors From Lease Obligations Upon Assignment Approval ........................39

III. BLM'S APPLICATION OF ITS REGULATIONS TO PONDEROSA WAS NOT ARBITRARY AND CAPRICIOUS .......45

IV. PONDEROSA'S SEVENTH AMENDMENT CLAIM FAILS .........48

A. The Basis For The Civil Penalty Lies In Equity .......................48

B. Even If The Civil Penalty Lies At Common Law, The Public Rights Exception Applies .............................................52

CONCLUSION ...........................................................................................54

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*,
430 U.S. 442 (1977) ....................49

*Barnes v. United States*,
776 F.3d 1134 (10th Cir. 2015)....................27

*Bronson v. Kinzie*,
42 U.S. 311 (1843) ....................33

*Burfenning v. Chi., St. P., M. & O. Ry. Co.*,
163 U.S. 321 (1896) ....................53

*Carr v. United States*,
560 U.S. 438 (2010) ....................35

*Citizens for Const. Integrity v. United States (CCI)*,
70 F.4th 1289 (10th Cir. 2023)....................22

*City of El Paso v. Simmons*,
379 U.S. 497 (1965) .................... 32, 35

*Corner Post, Inc. v. Board of Governors*,
603 U.S. 799 (2024) .................... 29, 33

*Coyote Portable Storage, LLC v. Pods Enters., Inc.*,
618 F. App'x 525 (11th Cir. 2015).................... 32, 35

*Crowell v. Benson*,
285 U.S. 22 (1932) ....................53

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
72 F.4th 1166 (10th Cir. 2023)....................46

*Edwards' Lessee v. Darby*,
25 U.S. 206 (1827) ....................44

*Erlenbaugh v. United States*,
409 U.S. 239 (1972) ....................36

*Ex parte Bakelite Corp.*,
279 U.S. 438 (1929) ....................53

*Forest Guardians v. U.S. Fish and Wildlife Serv.*,
611 F.3d 692 (10th Cir. 2010)....................22

*Geosearch, Inc. v. Hodel*,
801 F.2d 1250 (10th Cir. 1986)....................24

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)....................36

*Hicks on Behalf of Feiock v. Feiock*,
485 U.S. 624 (1988)....................49

*Holy Cross Wilderness Fund v. Madigan*,
960 F.2d 1515 (10th Cir. 1992)....................22

*Impact Energy Res., LLC v. Salazar*,
693 F.3d 1239 (10th Cir. 2012).................... 24, 25, 26, 27, 29

*In re Furr's Supermarkets, Inc.*,
283 B.R. 60 (B.A.P. 10th Cir. 2002).................... 36, 37

*In re Lucre Mgm't Group, LLC*,
365 F.3d 874 (10th Cir. 2004)....................50

*In re Montgomery Ward Holding Corp.*,
268 F.3d 205 (3d Cir. 2001)....................36

*Irwin v. Dep't of Veterans Affairs*,
498 U.S. 89 (1990).................... 24, 26

*Isbrandtsen Co. v. Johnson,*
343 U.S. 779 (1952)....................39

*Kannikal v. Att'y Gen. U.S.*,
776 F.3d 146 (3d Cir. 2015)....................26

*Kennedy Oil v. Luca Techs., Inc.*,
No. 12-CV-194-F, 2013 WL 12253555 (D. Wyo. Jan. 22, 2013)....................38

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)....................39

*Kleppe v. New Mexico*,
426 U.S. 529 (1976)....................54

*Law v. Nat'l Collegiate Athletic Ass'n*,
134 F.3d 1438 (10th Cir. 1998)....................50

*Law v. Nat'l Collegiate Athletic Ass'n*,
134 F.3d 1025 (*Law II*).................... 50, 51

*Lee's Ford Dock, Inc. v. Sec'y of the Army*,
865 F.3d 1361 (Fed. Cir. 2017)....................53

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 37, 43, 44

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 28, 29

*Mariner Energy, Inc. v. Devon Energy Prod. Co., L.P.*,
517 F. App'x 226 (5th Cir. 2013) .......... 30

*McCormick v. HRM Res., LLC*,
835 F. Supp. 3d 1181 (D. Colo. 2026) .......... 39

*McElrath v. United States*,
102 U.S. (12 Otto) 426 (1880) .......... 52

*McEvoy v. Diversified Energy Co.*,
No. 5:22-CV-171, 2023 WL 2808469 (N.D.W. Va. Apr. 4, 2023) .......... 30

*McFarland v. Mayo*,
65 Okla. 28, 162 P. 753 (1916) .......... 40

*Monahan v. U.S. Dep't of Interior*,
No. 05-8068, 2007 WL 2993577 (10th Cir. 2007) .......... 42, 47

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
59 U.S. (18 How.) 272 (1855) .......... 48

*Nagahi v. I.N.S.*,
219 F.3d 1166 (10th Cir. 2000) .......... 25

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) .......... 28

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) .......... 10, 11

*Norfolk Redevelopment & Housing Auth. v. Chesapeake & Potomac Tel. Co.,*
464 U.S. 30 (1983) .......... 41

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) .......... 22, 23

*Patchak v. Zinke*,
138 S. Ct. 897 (2018) .......... 24

*Reno v. Cath. Soc. Servs., Inc.*,
509 U.S. 43 (1993) .......... 28

*Reppy v. Dep't of Interior of U.S.*,
874 F.2d 728 (10th Cir. 1989) .......... 24

*Samantar v. Yousuf,*
560 U.S. 305 (2010) ....................................................................................39

*Sanders v. Sharp*,
153 Pa. 555, 25 A. 524 (1893) ......................................................................40

*SEC v. Jarkesy*,
603 U.S. 109 (2024) ............................................................... 48, 49, 52, 53

*Sorrentino v. I.R.S.*,
383 F.3d 1187 (10th Cir. 2004).............................................................. 41, 45

*Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*,
824 F. App'x 197 (5th Cir. 2020)............................................................ 29, 37

*Tull v. United States*,
481 U.S. 412 (1987) ........................................................................ 48, 49, 51

*United States ex rel. Cimino v. Int'l Bus. Machines Corp.*,
3 F.4th 412 (D.C. Cir. 2021) .........................................................................42

*United States v. A. S. Kreider Co.*,
313 U.S. 443 (1941) ......................................................................................25

*United States v. Conway*,
25 F. Cas. 598 (D. Ark. 1843) ........................................................................33

*United States v. Kwai Fun Wong*,
575 U.S. 402 (2015) ......................................................................................26

*United States v. Stein*,
452 F. Supp. 2d 276 (S.D.N.Y. 2006) ............................................................51

*Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................. 22, 23

*W. Oil Sales Corp. v. Bliss & Wetherbee*,
299 S.W. 637 (Tex. Comm'n App. 1927) ......................................................40

*Wachovia Bank v. Schmidt*,
546 U.S. 303 (2006) ......................................................................................36

*Weinberger v. Salfi*,
422 U.S. 749 (1975) ......................................................................................24

*Whitman v. Am. Trucking Associations*,
531 U.S. 457 (2001) ......................................................................................44

*Wilson v. Gerhardt*,
13 P. 705 (Colo. 1887) ...................................................................................40

*Wis. Cent. Ltd v. United States*,
585 U.S. 274 (2018) ....................................................................................36

**Statutes**

11 U.S.C. § 365(d)(3)....................................................................................36
28 U.S.C. § 1331 ..........................................................................................24
28 U.S.C. § 1491 ..........................................................................................52
28 U.S.C. § 1503 ..........................................................................................52
28 U.S.C. § 2401(a) ..................................................................... 25, 26, 29
30 U.S.C. § 1724(b)(1)....................................................................................36
30 U.S.C. § 187 ..........................................................................................4, 31
30 U.S.C. § 187b .................................................. 1, 4, 31, 32, 33, 37, 39, 44
30 U.S.C. § 188(a) ..................................................................................... 13, 54
30 U.S.C. § 189 ..........................................................................................37
30 U.S.C. § 226(g) .................................................................................. 6, 38, 39
30 U.S.C. § 226-2.................................................... 23, 24, 25, 26, 27, 28, 29
30 U.S.C. §§ 187a ........................................ 4, 5, 31, 35, 39, 41, 42, 43, 44, 45
41 U.S.C. § 7104(b)(1)....................................................................................52
42 U.S.C. § 405(h) ..........................................................................................24
5 U.S.C. § 701(a) ..........................................................................................25
5 U.S.C. § 706(2) ..........................................................................................21
5 U.S.C. §§ 701–706 ......................................................................................21
Pub. L. No. 100–203, 101 Stat. 1330 (1987) ..................................................6
Pub. L. No. 113-179, § 2(b), 128 Stat. 1913 (2014)........................................24
Pub. L. No. 79-696, 60 Stat. 955-56 (1946) ......................................................4
Pub. L. No. 85-145 § 30, 41 Stat. 449 (1920)...........................................4, 13
Wyo. Stat. Ann. § 30-5-304(a)(v)......................................................................16

**Regulations**

30 C.F.R. § 250.1702(a)....................................................................................30
30 C.F.R. § 250.1702(d) ....................................................................................30

30 C.F.R. § 250.1710 ....................30
30 C.F.R. §§ 221.53–56 ....................13
43 C.F.R. § 192.143 ....................45
43 C.F.R. § 192.143 (1949) ....................43
43 C.F.R. § 192.28 (1938 ed.) ....................31
43 C.F.R. § 192.28, Section 2(m) (1938 ed.) ....................13
43 C.F.R. § 3106.2-3(b) (1971) ....................8
43 C.F.R. § 3106.7-2 (1984) .................... 8, 9, 11, 12, 18, 21, 34
43 C.F.R. § 3106.72 (2024) ....................12
43 C.F.R. § 3106.7-2(b) .................... 18, 21, 27, 29, 31, 34, 38, 39, 46
43 C.F.R. § 3106.72(b) ....................30
43 C.F.R. § 3106.7-5 (1984) ....................8
43 C.F.R. § 3106.7-6(a) (2023) .................... 45, 46
43 C.F.R. § 3106.82 .................... 17, 18
43 C.F.R. § 3108.1 (1984) ....................9, 10
43 C.F.R. § 3162.3-4(a) ....................30
43 C.F.R. § 3163.1(a)(4) (2025) ....................13
43 C.F.R. § 3163.1(c) ....................46
43 C.F.R. § 3163.2 (2025) .................... 13, 14, 15
43 C.F.R. § 3163.2(g) ....................46
43 C.F.R. § 3163.4 (1983) ....................13
43 C.F.R. §§ 192.140–145 (1949 ed.) ....................8
43 C.F.R. §§ 192.41–43 (1938 ed.) ....................8
43 C.F.R. Part 192 (1938 ed.) ....................7
43 CFR § 3106.7-6(b) ....................46
43 CFR 3162.1(a) [2023] ....................18
43 CFR 3163.1(a)(2) ....................19

**Other Authorities**

11 Fed. Reg. 12956 (1946) ....................43

63 Fed. Reg. 1936 (1998) ....................................................................................11
66 Fed. Reg. 1883 (2001) ............................................................................... 11, 38
H.R. Rep. No. 100-378 (1987)..............................................................................6
U.S. CONST. art. IV, § 3, cl. 2 ..........................................................................54

# INTRODUCTION

Petitioner Ponderosa Resources, Inc. seeks to set aside the Bureau of Land Management's (BLM's) longstanding rule clarifying when abandonment obligations accrue under oil and gas leases. When BLM sells leases under the Mineral Leasing Act (MLA), lessees obtain the right to extract substantial volumes of oil and gas from federal reservoirs and keep most revenue associated with that production. In exchange, lessees agree to plug wells and reclaim lands to avoid damaging groundwater, mineral reservoirs, and public lands.

Ponderosa seeks to construe the MLA so that it may shirk its abandonment obligations. Because those obligations do not *become due* until production ceases, Ponderosa claims that the obligations are not "accruing" until that time. Ponderosa would thus escape its abandonment obligations, by assigning its nearly end-of-life lease to a defaulting assignee (also run by Ponderosa's President). When the assignee defaults, under Ponderosa's construction, taxpayers would be left holding the bag.

The Court should reject that construction, as abandonment obligations accrue when wells are added to a lease. The MLA confirms that such a "continued obligation" survives lease relinquishment. 30 U.S.C. § 187b. And it specifically empowers BLM to make rules concerning that "continued obligation," *id.*, "to ensure the complete and timely reclamation of the lease tract," *id.* § 226(g). BLM's accrual

rule is fully supported by the MLA, contemporaneous dictionaries, canons of construction and the common law.

Ponderosa also brings a Seventh Amendment claim, asserting a right to a jury trial over civil penalties. But those penalties did not issue until BLM provided Ponderosa with ample, repeated warnings that such penalties would flow if Ponderosa failed to plug its well. Such coercive or remedial penalties do not lie at common law.

Ponderosa's constitutional challenge also fails under the "public rights" exception. The Supreme Court has repeatedly held that categories of adjudications falling within Congress' plenary powers constitute "public rights" that need not be initially adjudicated in an Article III court. One such category is adjudications involving the administration of public lands, which is precisely what this case involves.

## BACKGROUND

## I. LEGAL BACKGROUND

### A. Under Common Law, Oil & Gas Assignments Do Not Release Assignors From Lease Obligations.

The common law has long recognized that assigning an oil and gas lease does not release the assignor from lease obligations. Mills, Law of Oil and Gas § 148 (1926) ("An assignment of the lease does not relieve the original lessee from liability on the covenants of the lease."); W.L. Summers, The Law of Oil and Gas § 553

(1958) ("An oil and gas lessee does not escape his duties to perform the covenants of the lease by assignment . . . ."); W.W. Thornton, The Law of Oil & Gas § 350 (Eugene Kuntz Supp. 1960) ("The assignment of the lease does not release the assignor from the fulfillment of the covenants or engagements contained in it . . . ."). The assignor remains bound to his duties given the "privity of contract between him and the lessor." Mills, Law of Oil and Gas § 148; W.L. Summers, The Law of Oil and Gas § 553; W.W. Thornton, The Law of Oil & Gas § 350.

The assignor's obligations continue "even though the assignee may likewise incur the duty of their performance." W.L. Summers, The Law of Oil and Gas § 553; Mills, Law of Oil and Gas § 145. Following assignment, the assignor "stands in the position of a surety for the performance of the covenants by the assignee." Mills, Law of Oil and Gas § 148; W.W. Thornton, The Law of Oil & Gas § 350 ("such assignor is in the position towards (the assignee) of a surety"). And the "assignee is regarded in fact as the principal debtor" for performance of lease duties. W.W. Thornton, The Law of Oil & Gas § 350. "But if the lessee is forced to pay, he may recover from his assignee, or any subsequent assignee for breaches happening during the particular assignee's period of tenure." W.L. Summers, The Law of Oil and Gas § 553.

**B. The Mineral Leasing Act Did Not Change The Common Law.**

When the Mineral Leasing Act (MLA) was originally enacted in 1920, it empowered the Secretary of the Interior to authorize lease relinquishments or approve lease assignments. Pub. L. No. 85-145 § 30, 41 Stat. 449 (1920) (codified as amended at 30 U.S.C. § 187). Under the 1920 Act, an assignment would not release the lessee from lease obligations; relinquishment, however, would—"upon acceptance" by the Secretary—relieve the lessee "of all future obligations under said lease." *Id.*

In 1946, Congress amended the MLA provisions concerning relinquishment and assignment. Pub. L. No. 79-696 §§ 7–8, 60 Stat. 955–56 (1946) (codified as amended and 30 U.S.C. §§ 187a–b). Any relinquishment became "subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and *to place all wells on the lands to be relinquished in condition for suspension or abandonment in accordance with the applicable lease terms and regulations*." *Id.* § 8 (codified at 30 U.S.C. § 187b) (emphasis added). Only "thereupon the lessee shall be released of all obligations thereafter accruing under said lease with respect to the lands relinquished, but no such relinquishment shall release such lessee, or his bond, from any liability for breach of any obligation of the lease, other than an obligation to drill, accrued at the date of the relinquishment." *Id.*

Consistent with the common law standard, the 1946 amendment extended lease duties to the approved assignee. *Id.* § 7 ("Upon approval of any assignment or sublease, the assignee or sublessee shall be bound by the terms of the lease to the same extent as if such assignee or sublessee were the original lessee, any conditions in the assignment or sublease to the contrary notwithstanding." (codified at 30 U.S.C. § 187a)). And it confirmed that "the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed" until the Secretary approves the assignment or sublease. *Id.* But section 7 of the 1946 amendment does not clearly specify whether the assignor's lease obligations persist, are reduced to secondary status (as a surety for the principal debtor assignee), are released entirely, or are affected in some other way.

Rather than clearly modify the common law concerning assignor release, the 1946 amendment mentions assignor release in only a single sentence concerning partial assignment: "Any partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned land." *Id.*

In 1987, Congress amended the MLA again to ensure that lessees, and not taxpayers, were responsible for reclamation obligations. Federal Onshore Oil and

Gas Leasing Reform Act of 1987 § 5102(d), Pub. L. No. 100–203, tit. V, subtitle B, 101 Stat. 1330, 1330-257–1330-258 (1987 Reform Act) (codified at 30 U.S.C. § 226(g)). The 1987 amendment mandates the Secretary "shall, by rule or regulation, establish such standards as may be necessary . . . to ensure the complete and timely reclamation of the lease tract, and the restoration of any lands or surface waters adversely affected by lease operations after the abandonment or cessation of oil and gas operations on the lease." *Id.* Congress adopted those provisions to ensure that "the holder of record of an oil or gas lease will be responsible for reclamation." H.R. Rep. No. 100-378, at 13 (1987).

The 1987 amendment further bars the Secretary from issuing leases or approving assignments to any "entity [that] has failed or refused to comply in any material respect with the reclamation requirements and other standards established under this section for any prior lease to which such requirements and standards applied." 30 U.S.C. § 226(g). The list of barred entities is commonly known as the "17(g) list."

### C. BLM's Regulatory Implementation Of Continuing Responsibility Did Not Change The Common Law.

After Congress adopted the MLA in 1920, the BLM's precursor[1] adopted regulations governing oil and gas leases. 43 C.F.R. Part 192 (1938 ed.). Those regulations created a standard oil and gas lease form. *Id.* § 192.28. And that form required lessees:

- "to plug properly and effectively all wells before abandoning the same," Section 2(l); and
- "[t]o abide by and conform to any and all reasonable regulations of the Secretary of the Interior now or hereafter in force, all of which regulations are made a part and condition of this lease," Section 2(m).

*Id.* That form further prohibited the lessee from:

- assigning his lease without written consent from the Secretary of the Interior, Section 2(p); and
- terminating his lease "until the lessee shall have made full provision for conservation and protection of the property," Section 5.

---

[1] Eighty years ago, President Truman merged the General Land Office and the U.S. Grazing Service to form the BLM. Reorganization Plan No. 3 of 1946 § 403, 60 Stat. 1097, 1100.

*Id.* Regulations governing assignments did not release the assignor from lease obligations, even when approved by the Secretary. *See* 43 C.F.R. §§ 192.41–43 (1938 ed.).

Following the 1946 MLA amendments, BLM amended its regulations governing assignment. *See* 43 C.F.R. §§ 192.140–145 (1949 ed.). Those regulations do not release any assignor obligations for complete assignments; instead, they state the assignee "will be responsible for the performance of all lease obligations" following assignment approval. *Id.* § 192.141(e). Partial assignments, however, were treated as creating "a separate and distinct lease," in which the "assignee becomes a lessee of the Government as to the segregated tract and is bound by the terms of the lease as though he had obtained the lease through an application filed in his own name." *Id.* § 192.143.

These two provisions continued—largely unchanged—in BLM's subsequent leasing regulations for decades, albeit renumbered. Under the heading "[c]ontinuing responsibility," BLM maintained the provision establishing assignee responsibility for "all lease obligations." *E.g.*, 43 C.F.R. § 3106.7-2 (1984); 43 C.F.R. § 3106.2-3(b) (1971). And BLM maintained the ability for partial assignments to create separate leases. *E.g.*, 43 C.F.R. § 3106.7-5 (1984); 43 C.F.R. § 3106.2-6(a) (1971).

Following the 1987 amendments to the MLA, BLM again updated its assignment regulations. In relevant part, those updates extended the "[c]ontinuing

responsibility" regulation to "a transfer of operating rights (sublease)." 43 C.F.R. § 3106.7-2 (1988). Thus, "the transferor and its surety shall continue to be responsible for the performance of all obligations under the lease until a transfer . . . of operating rights (sublease) is approved," without releasing the transferor from lease obligations following the sublease approval.

BLM also updated its relinquishment regulations following the 1987 MLA amendments. Its prior regulations had made relinquishment "subject to the continued obligation of the lessee and surety to make payments of all accrued rentals and royalties and to place all wells on the lands to be relinquished in condition for suspension or abandonment in accordance with the regulations and the terms of the lease." 43 C.F.R. § 3108.1 (1984). In 1988, BLM expanded "the continued obligation of the lessee and surety" to include "complet[ing] reclamation of lands or surface waters adversely affected by lease operations in a timely manner after abandonment or cessation of oil and gas operations on the lease." 43 C.F.R. § 3108.1 (1988).

In 1993, the Committee on Natural Resources of the U.S. House of Representatives released a report about unfunded environmental concerns. Staff of H. Comm. on Natural Resources, 103rd Cong., Deep Pockets: Taxpayer Liability for Environmental Contamination (Comm. Print 1993). That report explained that "[h]undreds of onshore oil and gas wells on federal lands may be improperly closed

or contaminated with oil and drilling waste." *Id.* at 1. Although "BLM has called in bonds rarely, because operators prefer to take corrective action rather than default," the report warned that "[f]orfeitures may increase in the future . . . because small operators may prefer to default rather than to abandon a well correctly." *Id.* at 14. The Committee urged federal agencies to "develop a comprehensive approach toward federal land management, one that minimizes the creation of new unfunded clean-up liabilities, while fairly and equitably sharing the costs of mitigating past environmental degradation." *Id.* at 3. A critical step, in the Committee's view, was "pursuing private entities that are responsible for contamination of public lands." *Id.*

Following the Deep Pockets report, BLM convened a committee to review its unfunded liabilities. *See* Elser Decl. Ex. A, BLM Oil and Gas Program, Bonding/Unfunded Liability Review (1995).[2] That committee produced a review making "moderate, but workable" recommendations that "attempted to be very mindful of the precarious nature that the federal government has to ensure reasonable protective measures without unduly burdening industry or affecting the ultimate recovery of oil and gas reserves." *Id.* at RUL0660. That review recommended that, given differing approaches across BLM regional offices, "BLM regulations and forms should clarify that assignors remain responsible for obligations that accrued

[2] The Court can take judicial notice of government publications. *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 n.22 (10th Cir. 2009).

prior to assignment, including the obligation to plug wells drilled or used." *Id.* at RUL0673–74. While the review also recommended modest increases in minimum bond amounts, it cautioned against raising bonds to provide "full insurance for the lease activities," as "to increase the bond beyond a reasonable amount would only serve to force a certain number of operators/lessees out of business" and "exacerbate the existing situation." *Id.* at RUL0678.

In 1998, BLM proposed a rule to implement recommendations from its Bonding/Unfunded Liability Review. Oil and Gas Leasing: Onshore Oil and Gas Operations, 63 Fed. Reg. 1936, 1942 (1998) ("This proposed rule . . . . would clarify the obligation of the assignor [for] well abandonment and environmental remediation when the [BLM] approves an assignment of record title or operating rights."). That proposed rule clarified BLM's "[c]ontinuing responsibility" regulation at 43 C.F.R. § 3106.7-2 to plainly state "[a]s the assignor or transferor, you remain responsible for plugging wells and abandoning facilities you drilled, installed or used prior to the effective date of the assignment or transfer." *Id.* at 1942. It further changed the heading of the "[c]ontinuing responsibility" regulation to: "If I transfer my lease, when do my obligations under the lease end?" *Id.*

After multiple extensions of the public comment period, BLM adopted a corresponding clarification of its continuing responsibility regulation. Oil and Gas Leasing: Onshore Oil and Gas Operations, 66 Fed. Reg. 1883, 1892 (2001). The final

rule modified the heading to "'If I transfer my lease, what is my continuing obligation?' to better reflect that the purpose of the section is to inform the lessee of its continuing obligations," *id.* at 1889, in line with the longstanding "[c]ontinuing responsibility" heading of this regulation, *supra* 8. And the regulation clarified for lessees that "[a]fter BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer," including "responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer." *Id.* at 1892.

In adopting those regulations, BLM rejected comments "suggest[ing] that the original lessee or operator should not be responsible for plugging and abandoning when control and all obligations have been conveyed to other parties." *Id.* at 1889–90. BLM explained that, "[w]hile we first look to the current lessee for lease compliance, we believe it prudent to reserve our rights against all parties who had the potential to benefit from the well's existence." *Id.* at 1890.

In 2024, BLM adopted minor stylistic changes to its continuing responsibility regulation. *Compare* 43 C.F.R. § 3106.72 (2024), *with* 43 C.F.R. § 3106.7-2 (2001).

### D. Congress Has Authorized BLM To Enforce Lease Requirements Through Appropriate Remedies.

When Congress originally enacted the MLA, it authorized the Department of the Interior to issues leases that "may provide for resort to appropriate methods for

the settlement of disputes or for remedies for breach of specified conditions thereof." Pub. L. No. 85-145 § 31, 41 Stat. 450 (1920) (codified as amended at 30 U.S.C. § 188(a)). And ensuing leases incorporated regulations "now or hereafter in force, all of which regulations are made a part and condition of this lease." 43 C.F.R. § 192.28, Section 2(m) (1938 ed.).

Over eighty years ago, Interior adopted administrative regulations to address lessee defaults. *See* 30 C.F.R. §§ 221.53–56 (1943 cum. supp.). One such regulation established liquidated damages for "failure to perform any operation ordered in writing by the supervisor." *Id.* § 221.54(a). And the damages for such failure were set at "the actual cost of performance [by or through the supervisor] and an additional 25 percent to compensate the Government for administrative costs." *Id.* That remedy continues to be available today. 43 C.F.R. § 3163.1(a)(4) (2025).

Over forty years ago, BLM also adopted a daily penalty remedy for noncompliance. 43 C.F.R. § 3163.4 (1983). That provision entitled the lessee "to notice of noncompliance and a hearing within 30 days after such notice." *Id.* A similar remedy continues to be available today. 43 C.F.R. § 3163.2 (2025).

## II. FACTUAL BACKGROUND

### A. Day Butte Well History

1. BLM issued an oil and gas lease for lands including the Day Butte well effective December 1, 1996 to Swanson & Morris LLC. SDR0410–21. That lease

requires the lessee to "place affected wells in condition for suspension or abandonment, reclaim the land as specified by the lessor and, within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells" when the property is returned to the lessor. SDR0411 § 12. The lessee must "take reasonable measures deemed necessary by the lessor"—including the "specification of interim and final reclamation measures"—to "minimize[] adverse impacts to the land, air, and water." *Id.* § 6. And the lessee must "prevent unnecessary damage to, loss of, or waste of leased resources." *Id.* § 4. All those obligations are binding upon the lessee and its successors-in-interest. *Id.* § 14.

In exchange for those plugging, reclamation and reservoir-protection obligations, the lessee obtains "the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas *(except helium)*" in the subject lands, SDR0410, along with the right to assign lease interests "[a]s required by regulations," SDR0411 § 11. Nothing in the lease creates in the lessee a right to release itself from plugging and reclamation obligations. *See id.* And the lessee's rights "are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulation and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease." SDR0410.

After the lease issued, the Day Butte well produced 874 MCF[3] of gas and 136 barrels of oil in December 1996. SDR0214.

2. On December 16, 1996, Swanson & Morris assigned record title interest in the lease to Ponderosa Resources Corporation. SDR0422–23. The assignment contains no release of obligations to Swanson & Morris. *See id.* To accept that assignment, Ponderosa was required to accept "all applicable terms, conditions, stipulations, and restrictions pertaining to the lease," specifically including the obligations "to condition all wells for proper abandonment" and "to restore the leased lands upon completion of any operations." SDR0423. Alan O'Hare, President of Ponderosa, signed the agreement accepting those obligations on behalf of Ponderosa. *Id.*

BLM approved the assignment, effective January 1, 1997, "solely for administrative purposes." SDR0422. BLM's approval form did not release Swanson & Morris from any lease obligation. *Id.*

From January 1, 1997, to July 1, 2011, Ponderosa retained an interest in the lease. *See* Ponderosa Br. 14. During that time, the Day Butte well produced 67,293 MCF of gas and 723 barrels of oil. *See* SDR0214–18.

[3] MCF is an abbreviation for "thousand cubic feet."

3. Ponderosa assigned its record title interests in the lease in a series of transactions culminating in 2011. SDR0008–9 (assigning 50% record title interest back to Swanson & Morris); SDR0424–25 (same for 17.5% interest to Bauer Oil & Gas, LLC); SDR0028–29 (same for final 32.5% interest to Equinox Resources LLC). None of those assignment forms released Ponderosa from the plugging and reclamation obligations it assumed in 1997. BLM approved those assignments "solely for administrative purposes." SDR0008; SDR0424; SDR00028.

By July 2011, the other record title interest owners[4] also assigned their interests to Equinox. *See* SDR0398. Equinox was majority owned by Alan O'Hare, SDR0023, who is also the President of Ponderosa, SDR0221.

Equinox then assigned its lease interests to Adcore Acquisition Group, SDR0398, subject to overriding royalty interests to Alan O'Hare and Swanson Production Company, SDR022. An "overriding royalty" interest means "a share of production, *free of the costs of production*, carved out of the lessee's interest under an oil and gas lease." Wyo. Stat. Ann. § 30-5-304(a)(v) (emphasis added).

Subject to those overriding royalty obligations, the company once known as Adcore held 100% record title interest in the lease by July 2011. *See* Ponderosa Br. 15; SDR0397–98. But Adcore had previously changed its name to Wind River

[4] These other record title owners were Swanson & Morris, Bauer Oil & Gas, and Swanson Production Company.

Hydrocarbons, Inc., SDR0132, SDR0134, without filing the requisite paperwork with BLM regarding the name change, *see* 43 C.F.R. § 3106.82. Wind River was instead listed as the operator on the lease. SDR120. Alan O'Hare is the President of Wind River. SDR0132.

Several years after Wind River (f.k.a. Adcore) acquired its interest, the lease had produced an additional 23,290 MCF of gas and 165 barrels of oil before it stopped producing in May 2014. *See* SDR0218. The lease then terminated in 2018. SDR0120.

**B. BLM Orders Concerning the Day Butte Well**

1. Following the lease termination, BLM issued a series of notices to the operator Wind River from 2019 to 2022, requiring Wind River to plug and abandon the Day Butte well. SDR0104–128 (directing these notices to Alan O'Hare). When Wind River did not comply with those notices, BLM proceeded to issue civil penalties to coerce Wind River's compliance with its lease obligations. SDR0117–128. After Wind River continued to shirk its obligations, BLM collected Wind River's $10,000 bond. SDR0140–142. And BLM placed both Wind River and Alan O'Hare on its "list of Entities in Noncompliance with Reclamation Requirements of Section 17(g) of the Mineral Leasing Act," thus prohibiting them from future leasing or record title assignments. SDR0147–150.

2. Because Wind River's $10,000 bond was insufficient to "cover the work necessary to plug the well and reclaim the location," SDR0142, BLM proceeded to issue plugging and abandoning notices to previous record title owners, *e.g.*, SUP0007–11 (Adcore[5]); SUP0031–36 (Bauer); SUP0037–42 (Equinox); SUP0049–54 (Swanson & Morris); SDR0207–12 (Ponderosa). The December 1, 2023, order to Ponderosa indicated that—as current record title owner Adcore and current operator Wind River had been unresponsive to BLM's request—Ponderosa was "responsible for plugging wells and abandoning facilities" it "used before the effective date of the assignment transfer" under "43 CFR 3106.7-2(b)." SDR0207–212 (Order No. 24SPG0001W). And BLM enclosed "the Master List of Record Title Owners and Operating Rights Holders," so that Ponderosa could "work cooperatively with the other previous owners in complying with the order." *Id.*

The plugging order directed Ponderosa "to submit a Notice of Intent [NOI] to plug and abandon" the Day Butte well within thirty days. *Id.* And it warned Ponderosa that failure to timely respond to the written order "is a violation of 43 CFR 3162.1(a) [2023] and will result in the issuance of an Incident of Noncompliance." *Id.*

[5] As Adcore had not filed paperwork with BLM indicating its name change to Wind River, BLM treated Adcore as a distinct prior record title owner. *See supra* 16–17.

3. Alan O'Hare, as President of Ponderosa, requested an extension of time to respond to the plugging order, which BLM granted. SDR0221 (extending compliance deadline to February 8, 2024). After Ponderosa failed to submit the required NOI by February 8, BLM issued a notice of Incidents of Noncompliance (INC) on February 9, 2024. SDR0257–58 (INC No. 24SPG0001l). That INC gave Ponderosa twenty days "to correct the non-compliance," and warned Ponderosa that a failure to "come into compliance within the stated time frame" may result in "assessments under 43 CFR 3163.1(a)(2)." SDR0257. Ponderosa thus had until February 28, 2024 to come into compliance without penalty.

After Ponderosa refused to submit the NOI, BLM issued a second INC to Ponderosa imposing an immediate $250 assessment on March 11, 2024. SDR0277–79 (INC No. 24SPG0001A). That same day, BLM issued a Notice of Proposed Civil Penalties (NCPC) to Ponderosa, explaining that additional daily penalties would be imposed—at escalating rates—if the violation was not corrected by April 8, 2024. SDR0291–92. BLM warned Ponderosa that these escalating daily penalties could ultimately result in $800,580 in civil penalties. But BLM explained that these penalties were purgeable: "If the violation is corrected on or before the abatement date of 8 April 2024, no civil penalty will be issued." SDR0292.

4. BLM issued similar series of notices to other previous record title owners. *E.g.*, SUP0031–36 (Bauer plugging order); SUP077–79 (Bauer first INC);

SUP0097–100 (Bauer $250 bill for second INC); SUP0104–08 (Notice of Proposed Civil Penalties to Bauer).

5. Unlike the other previous record title owners, however, Ponderosa responded—through counsel—to BLM's enforcement orders. Ponderosa's litigation counsel contacted BLM arguing that Ponderosa should not be required to pay for plugging and abandonment work given its limited capital. SDR0252–53. But Ponderosa was unable to document its allegedly limited capital with bank records predating May 2023, SDR0392, which is one month after Ponderosa's President was added to BLM's 17(g) list of noncompliant entities barred from leasing, SDR0147. Ponderosa claimed it lacked "ready access" to older bank records as its "previous bank account was criminally hacked." SDR0392.

On March 12, 2024, Ponderosa requested State Director Review of the first INC and sought to compromise its failure to submit an NOI. SDR0391–93. Ponderosa also requested that the State Director stay the accrual of assessments and penalties during his review. SDR0391. On March 19, the BLM agreed to stay enforcement actions pending its review. SDR0395–96.

On April 10, 2024, Ponderosa requested State Director Review of the second INC and NCPC. SUP0182–84.

6. On April 18, 2024, BLM issued two State Director Review decisions affirming the challenged BLM actions. SDR0404–09 (SDR No. WY-2024-010);

SUP0234–39 (SDR No. WY-2024-014). Both decisions were sent to Ponderosa's counsel by certified mail on April 18, 2024 and received at her law office by April 22, 2024. SUP0300–306; SUP0253; SUP0255; Petition for Review ("Pet. for Review") ¶¶ 59, 62, Dkt. 1. But Ponderosa's counsel reported that the package containing SDR No. WY-2024-010 may not have been delivered from her building's front desk to her law firm's suite. SUP0300.

7. After the opportunity to purge the civil penalties from the second INC expired, BLM sent Ponderosa a Civil Penalties letter on June 27, 2024 requesting payment of $800,580. CPL0022–23. That letter does not mention BLM's accrual regulation, 43 C.F.R. § 3106.7-2(b) (2001). *Id.*

On July 15, 2024 and August 7, 2024, BLM sent First and Second Demand Letters requesting payment, with interest, from the Bill for Collection sent with BLM's first INC. FDL0001–4; SDL0001–3. The last letter demanded $290.28. Neither letter mentions BLM's accrual regulation.

8. On July 22, 2024, Ponderosa filed its Petition for Review. Dkt. 1.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, governs judicial review of agency actions. Courts may "set aside" agency action that is arbitrary and capricious or contrary to law. 5 U.S.C. § 706(2).

"The arbitrary and capricious standard of review is a 'narrow one,' which mandates considerable deference to agency decisions." *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1527 (10th Cir. 1992). The Court must presume the challenged agency action is valid. *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 704 (10th Cir. 2010). Petitioners thus bear the burden of showing that the Interior "'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (quoting*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Under the APA's arbitrary and capricious standard of review, this Court reviews an agency's factual findings under the "substantial evidence" test. *Olenhouse*, 42 F.3d at 1575. "Evidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Id.* (quotation and citation omitted). The "substantial evidence" test thus "requires a court to ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Citizens for*

*Const. Integrity v. United States (CCI)*, 70 F.4th 1289, 1297 (10th Cir. 2023) (citation modified).

In evaluating whether the facts found by the agency are sufficient to support its action, the Court considers whether the agency "articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574 (10th Cir. 1994) (citing *State Farm*, 463 U.S. at 43).

## ARGUMENT

### I. MANY OF PONDEROSA'S CLAIMS ARE TIME BARRED.

#### A. Ponderosa Cannot Challenge Most Well-Specific Decisions.

Ponderosa's claims related to the plugging order, both INCS, and the SDR are barred by the MLA's statute of limitations because Ponderosa filed their petition for review more than ninety days after BLM issued its final decisions. Only the Civil Penalty and Demand Letters issued within ninety days of Ponderosa's suit, and those decisions merely collected on already-decided penalties.

Congress established a strict statute of limitations under the MLA, providing that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2. This "statutory deadline constitutes 'a condition to the [APA's] waiver of

sovereign immunity and thus must be strictly construed.'"[6] *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 (10th Cir. 2012) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)).

BLM's decisions clearly "involve" an "oil and gas lease" and issued more than ninety days before Ponderosa filed its petition for review, thus barring Ponderosa's claims relating to those decisions. 30 U.S.C. § 226-2. First, BLM issued a plugging order on December 1, 2023. SDR0207–212. Then, on February 15, 2024, BLM issued the first INC for noncompliance with its plugging order. SDR0257–259. Finally, on April 18, 2024, BLM issued a decision in the first SDR affirming the INC. SDR0404–409. Ponderosa did not file a Petition for Review until July 22, 2024—ninety-five days after the final April 18, 2024 decision on the INC. Because "[t]he MLA very clearly starts the clock on the date of 'the final decision of the

[6] The Tenth Circuit held in *Geosearch, Inc. v. Hodel*, 801 F.2d 1250, 1252 (10th Cir. 1986), *overruling on other grounds recognized by Impact Energy*, 693 F.3d at 1245 n.1, that the MLA's statute of limitations is jurisdictional. Since that decision, the Tenth Circuit has observed in footnotes without deciding that an intervening Supreme Court decision may affect the *Geosearch* holding. *See Impact Energy*, 693 F.3d at 1245 n.1; *Reppy v. Dep't of Interior of U.S.*, 874 F.2d 728, 730 n.5 (10th Cir. 1989). Respondents maintain that the *Geosearch* holding is correct because the MLA's statute of limitations contains language similar to other statutes that the Supreme Court has found to be jurisdictional. *Compare* 30 U.S.C. § 226-2 ("No action . . . . shall be maintained . . . .") *with Patchak v. Zinke*, 138 S. Ct. 897, 904–06 (2018) ("[A]n action . . . shall not be filed or maintained in a Federal court . . ." (quoting Gun Lake Trust Land Reaffirmation Act, Pub. L. No. 113-179, § 2(b), 128 Stat. 1913 (2014)); *Weinberger v. Salfi*, 422 U.S. 749, 756 (1975) ("[N]o action ... shall be brought under [28 U.S.C. § 1331] . . . ." (quoting 42 U.S.C. § 405(h))).

Secretary,'" *Impact Energy*, 693 F.3d at 1245 (citing 30 U.S.C. § 226-2), Ponderosa's claims related to the first INC are barred as they were not "commenced or taken within ninety days after the final decision of the Secretary," 30 U.S.C. § 226-2.

The fact that Ponderosa's claims arise under the APA does not make the APA's general six-year limitations period applicable. *Impact Energy* squarely holds that § 226-2's specific ninety-day limitations period governs an APA action contesting a final decision involving an oil and gas lease. 693 F.3d at 1244–46. There, as here, the plaintiffs invoked the APA's waiver of sovereign immunity and asserted claims under the APA, but the Tenth Circuit applied § 226-2 because the APA itself precludes review "to the extent that . . . statutes preclude judicial review," 5 U.S.C. § 701(a), and the MLA provides that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained" unless filed within ninety days. *Impact Energy*, 693 F.3d at 1244–45. The court expressly contrasted § 226-2 with the six-year period that "generally" governs APA claims and held that the MLA's specific limitations provision controlled the action before it. *Id*. at 1245–46.[7]

---

[7] For similar reasons, Ponderosa's claims are not governed by the default six-year statute of limitations for civil claims against the United States, 28 U.S.C. § 2401(a), which applies only "[i]n the absence of a specific statutory limitations period." *See Nagahi v. I.N.S.*, 219 F.3d 1166, 1171 (10th Cir. 2000); *see also United States v. A.*

Because the MLA's statute of limitations is jurisdictional, equitable tolling is not permitted. *See United States v. Kwai Fun Wong*, 575 U.S. 402, 408–09 (2015); *see supra* n.6. Even assuming equitable tolling is available under § 226-2, however, Ponderosa cannot satisfy the demanding standard for obtaining it. Equitable tolling is granted only "sparingly," including where a plaintiff has been actively misled, lulled into inaction, or "in some extraordinary way been prevented from asserting" its rights. *Impact Energy*, 693 F.3d at 1246. Here, BLM did nothing to prevent Ponderosa from filing on time. To the contrary, tracking information establishes that BLM's decision was delivered and received only four days after it issued. SUP0300–301 (Ponderosa's counsel stating that the "mail room is on the first floor of [their] building" and may not have routed a mailing to their "suite"); SUP0253. Any subsequent error in routing the decision through a law firm's mailroom cannot be attributed to BLM, and amounts at most to the type of "garden variety claim of excusable neglect" that does not warrant equitable tolling. *Impact Energy,* 693 F.3d at 1248 (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).

---

*S. Kreider Co.*, 313 U.S. 443, 447 (1941) (holding that a "specific provision" establishing a shorter statute of limitations for claims against the government applied over the general six-year statute of limitations, as the negative phrasing of the general statute "was intended merely to place an outside limit on the period within which all suits might be initiated"); *Kannikal v. Att'y Gen. U.S.*, 776 F.3d 146, 150 (3d Cir. 2015) ("That specific statute governs, and § 2401(a) is inapplicable.").

Moreover, Ponderosa indisputably had actual notice of BLM's decision with approximately twenty days remaining in the statutory periodyet still failed to file until five days after the deadline. *See* SUP0304. *Impact Energy* forecloses tolling in these circumstances. There, the Tenth Circuit held that delayed notice did not justify tolling where the plaintiffs still had sufficient time to sue, explaining that tolling generally is unwarranted unless delayed notification makes it impossible reasonably to comply with the filing deadline. 693 F.3d at 1247–48. The court further observed that even 45 days remaining after learning the operative date of the agency decision was more than the 30 days it had previously found sufficient to timely file. *Id.* at 1248; *see also Barnes v. United States*, 776 F.3d 1134, 1150 (10th Cir. 2015) (relying on *Impact Energy* and rejecting tolling where plaintiffs had approximately one month to timely act). Ponderosa identifies no circumstance that prevented it from filing during the twenty days its litigation counsel indisputably had actual notice; its own internal mail-handling error therefore provides no equitable basis for extending Congress's ninety-day deadline.

### B. Ponderosa Cannot Circumvent The Mineral Leasing Act's Statute Of Limitations By Facially Challenging 43 C.F.R. § 3106.7-2(b).

Ponderosa cannot evade § 226-2's ninety-day deadline by recasting its challenge to a 2001 regulation under the APA. Absent a statutory provision authorizing immediate review, "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the

controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The Supreme Court has repeatedly reaffirmed that principle. *See Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–12 (2003) (quoting *Lujan* and holding facial challenge to agency regulation unripe before its application in a concrete setting); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57–59 (1993) (relying on *Lujan* and holding that challenges to regulations generally do not ripen until the regulation is applied to the plaintiff). Indeed, *Lujan* explained that once BLM takes concrete action applying an allegedly unlawful rule, a plaintiff may challenge the underlying rule "in the course of an otherwise proper court challenge" to that action. 497 U.S. at 893 n.3 & 894.

Here, that concrete action is BLM's December 2023 decision applying the 2001 regulation to Ponderosa, which Ponderosa never internally appealed within BLM. Even were the final decision applying considered to be SDR No. WY-2024-010, that decision still issued more than ninety days before Ponderosa brought suit. "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2.

*Corner Post, Inc. v. Board of Governors*, 603 U.S. 799 (2024), does not alter that conclusion. *Corner Post* addressed when an APA claim accrues under the general six-year limitations period in 28 U.S.C. § 2401(a), holding that a claim accrues when the plaintiff has a complete and present cause of action and suffers injury from final agency action. *Id.* at 809–14. It did not displace the Court's ripeness decisions or hold that a plaintiff may separate a challenge to an old regulation from the concrete agency action that applies the regulation and causes the asserted injury. Here, Ponderosa's alleged injury arose when BLM applied the 2001 regulation in the final decision Ponderosa now challenges. Thus, although Ponderosa may contest the regulation's statutory validity in an otherwise proper challenge to that decision, *Lujan*, 497 U.S. at 894, that claim remains part of an "action contesting a decision of the Secretary involving [an] oil and gas lease" and is subject to § 226-2's specific ninety-day deadline. *See Impact Energy*, 693 F.3d at 1244–46. *Corner Post* does not permit Ponderosa to circumvent that specific limitation by relabeling the same dispute as a facial APA challenge governed by § 2401(a).

## II. PONDEROSA'S CHALLENGE TO 43 C.F.R. § 3106.7-2(b) FAILS.

### A. Abandonment Obligations Accrue With Each Well.

Abandonment obligations typically arise when an oil and gas well is drilled. *E.g.*, *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, 824 F. App'x 197, 206 (5th Cir. 2020) ("abandonment obligations arose when Total drilled the wells

on the property"); *McEvoy v. Diversified Energy Co.*, No. 5:22-CV-171, 2023 WL 2808469, at *9 (N.D.W. Va. Apr. 4, 2023) (the "obligation to plug the wells . . . . arose when the relevant operator drilled the well and incurred the obligation to eventually plug the well in the future"); *Mariner Energy, Inc. v. Devon Energy Prod. Co.*, 690 F. Supp. 2d 558, 564 (S.D. Tex. 2010) (decommissioning "obligations accrue when a well is drilled"), *aff'd sub nom. Mariner Energy, Inc. v. Devon Energy Prod. Co., L.P.*, 517 F. App'x 226 (5th Cir. 2013). Although such obligations generally do not "mature" or become due until production ceases, "the fact that an oil and gas operator drilled a well . . . necessarily gives rise to an obligation on the part of the operator or its successor to plug the well." *McEvoy*, 2023 WL 2808469, at *9.

Consistent with that approach, federal oil and gas regulations establish that abandonment obligations "accrue" when wells are drilled. 30 C.F.R. § 250.1702(a) (offshore); 43 C.F.R. § 3106.72(b) (onshore).[8] And those obligations "accrue" long before they become due or mature. *See* 30 C.F.R. § 250.1710 ("You must permanently plug all wells on a lease within 1 year after the lease terminates."); 43

[8] These regulations also prescribe additional actions that will cause abandonment obligations to accrue. *E.g.*, 30 C.F.R. § 250.1702(d) ("become a lessee"); 43 C.F.R. § 3106.72(b) ("use[]" a facility).

C.F.R. § 3162.3-4(a) ("operator must promptly plug and abandon" a producing well "no longer capable of producing oil or gas in paying quantities").

Ponderosa challenges whether "lease obligations that accrued before the [assignment or transfer] approval date" include "responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer." 43 C.F.R. § 3106.7-2(b) (2001). That longstanding regulation—in Ponderosa's view—violates a 1946 statute's putative release of assignors, upon assignment approval, from "obligations thereafter accruing." Ponderosa Br. 22–26 (quoting 30 U.S.C. § 187a).

But the 1946 amendments to the MLA establish that abandonment obligations accrue with each well "even when production continues afterward." *Contra* Ponderosa Br. 23. Upon relinquishment, the lessee is "relieved of all *future* obligations under said lease." 30 U.S.C. § 187 (emphasis added). But the lessee remains subject to the "*continued* obligation . . . to place all wells on the lands to be relinquished in condition for suspension or abandonment in accordance with the applicable lease terms and regulations." *Id.* § 187b (emphasis added). When Congress enacted that "continued obligation," *id.*, Interior's standard lease terms required the lessee to make "full provision for conservation and protection of the property" and "plug properly and effectively all wells before abandoning the same." 43 C.F.R. § 192.28 (1938 ed.). Because that "continued obligation" survives

relinquishment, it accrued by the date of relinquishment, regardless whether production had ceased. *See* 30 U.S.C. § 187b (upon relinquishment, "the lessee shall be released of all obligations thereafter accruing under said lease . . . , but no such relinquishment shall release such lessee, or his bond, from any liability for breach of any obligation of the lease, other than an obligation to drill, accrued at the date of the relinquishment").

Tellingly, Ponderosa ignores the "continued obligation" provision of § 187b. *See* Ponderosa Br. 22–23 (nonetheless urging "parallels" between assignment and relinquishment). Rather than address the *only* MLA provision concerning when abandonment obligations accrue, Ponderosa's accrual argument focuses on inapposite legal principles from caselaw having nothing to do with the MLA. *Id.* at 27–30 (focusing on claim accrual, not obligation accrual).

But this suit concerns when abandonment *obligations* accrue under Ponderosa's lease, not when BLM accrues a *claim* for breach of those obligations. *Contra* Ponderosa Br. 27–28. "[W]hen an 'obligation' accrues is not necessarily the same as when a 'claim' accrues." *Coyote Portable Storage, LLC v. Pods Enters., Inc.*, 618 F. App'x 525, 533 (11th Cir. 2015). The Supreme Court has a "long line of cases recognizing a distinction between contract obligation and remedy." *City of El Paso v. Simmons*, 379 U.S. 497, 503 (1965) (collecting cases). One critical difference is timing: "The obligation of a contract arises at the time the contract is

made, and continues until it be performed or discharged. The remedy to enforce the obligation of the contract does not arise until there is a failure to perform the obligation." *United States v. Conway*, 25 F. Cas. 598, 598 (D. Ark. 1843) (citing *Bronson v. Kinzie*, 42 U.S. 311, 321 (1843)). And the MLA distinguishes between when "obligations" accrue and when "liability for breach of any obligation" accrues. *See* 30 U.S.C. § 187b (upon relinquishment, releasing the lessee from "all obligations thereafter accruing," while preserving "liability for breach of any [accrued] obligation of the lease," including a "continued obligation" that endures past relinquishment).

In collapsing the distinction between obligation and claim accrual, Ponderosa ignores the established meanings of the term "accruing." To determine the meaning of legal terms like "accruing," courts look to contemporaneous legal dictionaries. *See Corner Post, Inc.*, 603 U.S. at 810. In 1946, "accrue" had two meanings. *See* Black's Law Dictionary 29 (3d ed. 1933) (Black's); James A. Ballentine, The Self-Pronouncing Law Dictionary 11 (2d student ed. 1948) (Ballentine).

Primarily, "accrue" meant "[t]o grow to; to be added to; to attach itself to," like "interest to the principal debt." Black's 29 (3d ed. 1933). This meaning was "its generally accepted sense." Ballentine 11. Popular dictionaries recognize similar

definitions.[9] BLM's challenged accrual regulation accords with this generally accepted meaning; when wells are "added to" an oil and gas lease, obligations associated with those wells "accrue" at the same time. After an assignment is approved, however, obligations associated with later-added wells do not accrue to the assignor. *See* 43 C.F.R. § 3106.7-2(b) (2001).

Secondarily, "accrue" meant "to arise, to happen, to come into force or existence; to vest." Black's 29 (3d ed. 1933). This meaning is associated with "independent or original demands," rather than ones "subordinate or accessory" to a "principal." *Id.* Because Ponderosa's suit asks when well obligations subordinate to a principal lease are "accruing," this meaning has less relevance. But BLM's accrual regulation also accords with this secondary meaning; when wells come into existence (*i.e.*, are drilled), associated abandonment obligations accrue. *See* 43 C.F.R. § 3106.7-2(b) (2001).

Unable to prevail under either meaning of "accrue," Ponderosa advances a third meaning: "to come into existence *as an enforceable claim or right*." Ponderosa Br. 27 (quoting Black's Law Dictionary (12th ed. 2024)) (emphasis added). Because

---

[9] Funk & Wagnalls, New Standard Dictionary of the English Language 21 (1946) ("To come as a natural result or increment, as by growth, business, etc."; "arise, as an addition, accession, or advantage"); Webster's New International Dictionary 17 (2nd ed. 1942) (Webster's) ("To be added by ordered growth in process of time, whether as increase or decrease, esp. in financial matters; as damages *accrue*.").

plugging liability "does not become fixed" until the "cessation of production"—Ponderosa contends—the "duty to plug" cannot "become enforceable" or "due" before production ceases. *Id.* at 29. And the obligation only "accrues," in Ponderosa's view, when it becomes enforceable or due. *Id.* The Court should reject Ponderosa's construction for four reasons.

1. As Ponderosa concedes, its construction of "accrue" is "[f]or legal claims"—not obligations. *Id.* at 27. To the extent contemporaneous dictionaries include "enforceable" in the definition of "accrue," it is "[a]s applied to a cause of action" or claim. Ballentine 11; *see also* Webster's 17 ("To come into existence as an enforceable claim; to vest as a right; as, a cause of action has *accrued* when the right to sue has become vested.").[10] Given the long-recognized "distinction between contract obligation and remedy," *Simmons*, 379 U.S. at 503, "when an 'obligation' accrues is not necessarily the same as when a 'claim' accrues," *Coyote Portable*, 618 F. App'x at 533.

[10] To the extent later legal dictionaries recognize that "accrued" can convey the "sense of due and payable," that meaning is specific to its "past tense." *E.g.*, Black's Law Dictionary 19 (6th ed. 1990). Because the relevant statute does not use the past tense, *see* 30 U.S.C. § 187a ("obligations thereafter accruing"), this meaning does not apply, *Carr v. United States*, 560 U.S. 438, 448 (2010) ("we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach") (citation omitted).

2. The meaningful-variation canon counsels against Ponderosa's construction. When legislating over federal oil and gas royalty obligations, Congress adopted a statute of limitations based on when "the obligation becomes due," 30 U.S.C. § 1724(b)(1),[11] not when the obligation "accrues." Courts "usually 'presume differences in language like this convey differences in meaning.'" *Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) (quoting *Henson v. Santander Consumer USA Inc.,* 582 U.S. 79, 86 (2017)). But Ponderosa's construction would collapse any difference in meaning between when an obligation "accrues" and "becomes due."

3. The Tenth Circuit Bankruptcy Appellate Panel rejected a similar argument that lease obligations arise only when enforceable. *In re Furr's Supermarkets, Inc.*, 283 B.R. 60, 62, 66–68 (B.A.P. 10th Cir. 2002). In determining when lease obligations "arise" under 11 U.S.C. § 365(d)(3), the court rejected the view that "'an obligation arises when one becomes legally obligated to perform,'" as it would "unravel[] the priority scheme of the Bankruptcy Code." *Id.* at 68–69 (quoting *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir. 2001)). Finding the Seventh Circuit's position (as articulated by Judge Posner) more persuasive, the court instead held that "lease obligations 'arise' under § 365(d)(3) as the obligations

---

[11] Although this language was adopted several decades later—in 1982—the Supreme Court has recognized that "statutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)).

accrue." *Id.* at 66–70. This Court should similarly recognize the difference between when lease obligations become enforceable and when they accrue.

4. The MLA empowers BLM to articulate when abandonment obligations accrue. In the offshore context, the accrual of abandonment obligations is governed by contract terms and government regulations. *See Total E&P*, 824 F. App'x at 204–06. So too under the MLA, which imposes on lessees continued abandonment obligations "*in accordance with the applicable lease terms and regulations*." 30 U.S.C. § 187b (emphasis added); *see also id.* § 189 (creating authority "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter"). Federal onshore leases thus impose binding obligations to plug wells in accordance with regulations "now or hereafter in force." *Supra* 7. As private actors may draft contracts establishing amongst themselves "*when* those obligations accrued," *Total E&P*, 824 F. App'x at 204, the MLA empowers BLM "to prescribe rules to 'fill up the details'" of when obligations accrue for federal lessees, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).

The MLA's delegation of rulemaking authority not only empowers BLM to "prescribe necessary and proper rules" to accomplish its "purposes," 30 U.S.C. § 189, it also requires BLM to "by rule or regulation, establish such standards as may be necessary to ensure . . . the complete and timely reclamation of the lease

tract," *id.* § 226(g). One such standard BLM established is that abandonment obligations accrue when a well is "drilled, installed, or used," 43 C.F.R. § 3106.7-2(b) (2001), thus preserving BLM's "rights against all parties who had the potential to benefit from the well's existence," 66 Fed. Reg. at 1890. While BLM also considered the option of significantly increasing bond amounts, it declined to do so to avoid unduly burdening industry, which would interfere with the MLA's mineral production purpose and only exacerbate the reclamation problem by forcing small-operator bankruptcies. *Supra* 11. And by clarifying when abandonment obligations accrue, BLM ensured that the assignor "stands in the position of a surety for the performance of the [accrued] covenants by the assignee," Mills, Law of Oil and Gas § 148, thus fulfilling the statutory directive to establish "surety, or other financial arrangement[s]" to guarantee that reclamation occurs, 30 U.S.C. § 226(g).

BLM's longstanding accrual regulations provide a consistent backdrop against which lessees and operators can contract. Thus, an assignor wishing to effectively discharge itself of liability for all wells "drilled, installed, or used" during its lease tenure, 43 C.F.R. § 3106.7-2(b) (2001), can contract with an assignee "required to post reclamation bonds" in sufficient amounts, *see Kennedy Oil v. Luca Techs., Inc.*, No. 12-CV-194-F, 2013 WL 12253555, at *1 (D. Wyo. Jan. 22, 2013). But setting aside BLM's accrual regulation would undo decades of liability allocation amongst private parties, ultimately forcing taxpayers to bear these

reclamation responsibilities. *See McCormick v. HRM Res., LLC*, 835 F. Supp. 3d 1181, 1185 (D. Colo. 2026) (discussing a "common pattern in the industry: smaller operators . . . acquire marginal wells from large oil companies, extract any remaining value, and then pass the wells further down the chain to even smaller companies . . . that dissipate the future plugging costs by declaring bankruptcy or dissolving").

The Court should not adopt a construction of "accruing" that "allows oil and gas companies along the entire chain to avoid the costs of plugging their wells." *Id.* Such a construction would conflict with the MLA, where Congress has established a "continued [abandonment] obligation," 30 U.S.C. § 187b, and required BLM "to ensure the complete and timely reclamation of the lease tract," *id.* § 226(g).

### B. Congress Did Not Completely Release Assignors From Lease Obligations Upon Assignment Approval.

Even were Ponderosa correct about when abandonment obligations are "accruing" under the MLA, its challenge to 43 C.F.R. § 3106.7-2(b) (2001) would still fail; it has failed to establish that Congress adopted clear and specific language releasing complete assignors, upon assignment approval, of "obligations thereafter accruing," 30 U.S.C. § 187a.

"When a statute covers an issue previously governed by the common law, we must presume that 'Congress intended to retain the substance of the common law." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (citation modified) (quoting *Samantar v. Yousuf,* 560 U.S. 305, 320 n. 13 (2010)); *Isbrandtsen Co. v.*

*Johnson,* 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: the Interpretation of Legal Texts* 318 (2012).

Here, the common law of oil and gas assignments in 1946 established that an assignment did not release an assignor from lease covenants, even if it also imposed liability for performance of lease covenants on the assignee. *Supra* 2–3; *e.g.*, *Sanders v. Sharp*, 153 Pa. 555, 567, 25 A. 524, 527 (1893) ("nor can it be successfully maintained that the mere assignment of [an oil and gas] lease by the appellant . . . discharged him from liability on his covenants therein" (citation omitted)); *W. Oil Sales Corp. v. Bliss & Wetherbee*, 299 S.W. 637, 638 (Tex. Comm'n App. 1927) ("When a contract is assignable, a party may assign the benefits of his contract to another, and delegate to his assignee the performance of his obligations under the contract; but he remains liable for the proper performance of those obligations, unless the other party to the contract consents for the assignment to have the effect of releasing him." (citation omitted)).[12] Although the assignee becomes principally

---

[12] Those common law principles of preserving assignor obligations are not unique to oil and gas leases. *See, e.g.*, *McFarland v. Mayo*, 65 Okla. 28, 162 P. 753, 755-56 (1916) (collecting cases for the proposition that a lessee cannot avoid liability under express covenants by assigning their lease); *Wilson v. Gerhardt*, 13 P. 705, 705

responsible for performance of lease covenants, the assignor stands in the position of surety to the assignee. *Supra* 3.

That "common law ought not to be deemed to be repealed" by the MLA, "unless the language of the statute be clear and specific for this purpose." *Sorrentino v. I.R.S.*, 383 F.3d 1187, 1193–94 (10th Cir. 2004) (quoting *Norfolk Redevelopment & Housing Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 35 (1983)). And Ponderosa has failed to identify any such "clear and specific" language in the MLA that repeals this common law standard. *See* Ponderosa Br. 21–23.

Ponderosa first looks to the MLA's extension of lease obligations to the assignee following assignment approval. *Id.* at 22. But making the assignee "bound by the terms of the lease to the same extent as if such assignee . . . were the original lessee," 30 U.S.C. § 187a, merely follows the common law practice of making the assignee "likewise incur the duty of [lease] performance." W.L. Summers, Law of Oil and Gas § 553; Mills, Law of Oil and Gas § 145. That the assignee becomes "regarded in fact as the principal debtor" for performance of lease duties does not completely release the assignor. W.W. Thornton, The Law of Oil & Gas § 350.

---

(Colo. 1887) ("[A] release is not to be implied from the mere fact of assent to the assignment. A lessee who assigns his lease does not thereby discharge himself of his obligation under it. He remains liable upon his express covenants to pay rent in an action by the lessor, even if the lessor has accepted the assignee as his tenant, and collected rent from him.").

Following assignment, the assignor still "stands in the position of a surety for the performance of the covenants by the assignee." Mills, Law of Oil and Gas § 148; W.W. Thornton, Law of Oil & Gas § 350 ("such assignor is in the position towards (the assignee) of a surety").

Nor does the continued responsibility of the assignor *until approval* demonstrate that Congress intended to completely release the assignor from responsibility following approval, much less do so clearly and specifically. *Contra* Ponderosa Br. 3–4; *see* 30 U.S.C. § 187a ("Until such approval, however, the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed."). As the Tenth Circuit has already held, "[i]t is not clear whether this releases the assignor/sublessor, or whether the assignee/sublessee becomes jointly liable with the assignor/sublessor." *Monahan v. U.S. Dep't of Interior*, No. 05-8068, 2007 WL 2993577, at *4 (10th Cir. 2007). And "the negative implication canon may have less force where the exclusion is a common law rule." *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 419 (D.C. Cir. 2021) (citation modified). The assignor's continued responsibility until assignment approval "as if no assignment or sublease had been executed," 30 U.S.C. § 187a, accords with the common law: before assignment, the assignor is the principal obligee; after

assignment, the assignee becomes the principal obligee and the assignor becomes a surety to the assignee's performance, *supra* 3.

Ponderosa last turns to the partial assignment clause: "Any partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands." 30 U.S.C. § 187a. According to Ponderosa, "[t]he phrase 'as above provided' makes clear that the same release applies to full assignments." Ponderosa Br. 22. Ponderosa's argument fails for three reasons.

1. Contemporaneous implementation of the partial assignment clause demonstrates that partial and full assignments were not to be treated alike. In implementing § 187a, BLM promulgated regulations governing partial assignments. *See* 11 Fed. Reg. 12956, 12961-62 (1946). Under those regulations, partial assignments created "a separate and distinct lease." 43 C.F.R. § 192.143 (1949). In contrast, full assignments enabled joint liability relationships with respect to a transferred lease. *See id.* § 192.141(c) ("Where an assignment does not create separate leases, the assignee, if the assignment so provides, may become a joint principal on the bond with the assignor.").

When construing "'a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect.'" *Loper Bright*,

603 U.S. at 386 (quoting *Edwards' Lessee v. Darby*, 25 U.S. 206, 210 (1827)). Given the "great respect" owed to BLM's contemporaneous interpretation, *id.*, the Court should recognize that partial and full assignments have distinct effects under § 187a. Because one such difference is that full assignments can create a joint liability relationship between assignee and assignor, § 187a should not be interpreted to require a complete release for full assignments.

2. Ponderosa's argument relies on its incorrect assumption that "[i]t would be illogical" to treat full and partial assignments differently with respect to releases provided. Ponderosa Br. 22. But the policy concerns that motivated the partial assignment provisions in § 187a demonstrate Ponderosa's error. Those provisions were added "so that the segregated, undeveloped portion [of a lease] would continue," despite the lack of production that would normally require immediate termination of the segregated lease. S. Rpt. No. 79-1392, at 9 (1946). And assigning an undeveloped portion of a lease carries starkly different "continued obligation" concerns than a full assignment of a developed lease with existing wells that must eventually be plugged. *See* 30 U.S.C. § 187b.

3. The phrase "as above provided" should not be construed as explaining a previously unmentioned release accompanying a full assignment. *See* 30 U.S.C. § 187a. Just as Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. Am. Trucking*

*Associations*, 531 U.S. 457, 468 (2001), it also does not repeal the common law without "clear and specific" statutory language, *Sorrentino*, 383 F.3d at 1193–94.

Instead, "as above provided" is best interpreted as *qualifying* the newly described release accompanying a partial assignment. *See* 30 U.S.C. § 187a. To obtain the "release and discharge . . . from all obligations thereafter accruing *with respect to the [segregated] assigned lands*," *id.* (emphasis added), the assignor must "as above provided" take certain steps. Those steps include filing in triplicate and providing "proof of the qualification under this chapter of the assignee . . . to take or hold such lease." *See id.* . Because the partial assignment creates "a separate and distinct lease," 43 C.F.R. § 192.143 (1949), the partial assignment provision states that those "above provided" steps must be followed for that newly segregated lease to entitle the assignor to a release "from all obligations thereafter accruing with respect to the [segregated] assigned lands," 30 U.S.C. § 187a.

## III. BLM'S APPLICATION OF ITS REGULATIONS TO PONDEROSA WAS NOT ARBITRARY AND CAPRICIOUS.

Ponderosa next argues that BLM acted arbitrarily in applying its regulations to Ponderosa's requests. Ponderosa Br. 38–40. But none of Ponderosa's arguments are availing.

1. BLM did not arbitrarily cite 43 C.F.R. § 3106.7-6(a) (2023) in SDR WY-2024-010. *Contra* Ponderosa Br. 40. That regulation states that assignees "assume the responsibility to plug and abandon all wells which are no longer capable of

producing." 43 C.F.R. § 3106.7-6(a). And BLM cited it, SDR0406, when responding to Ponderosa's letter arguing that it would be "inequitable" to make Ponderosa plug a well it "neither drilled nor installed." *See* SDR0393.

Even if BLM should also have cited 43 C.F.R. § 3106.7-2(b), that is no basis for finding its decision arbitrary. It also cited "43 CFR § 3106.7-**6**(b)." SDR0406 (emphasis added). A one-character typo hardly makes agency action arbitrary. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023) ("we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (citation omitted)).

2. Nor did BLM act arbitrarily in declining to explain its reasons for denying Ponderosa's request to compromise or reduce its assessments. *Contra* Ponderosa Br. 39. The relevant regulations require an explanation *only* if such a request is granted. *See* 43 C.F.R. § 3163.1(c) ("In compromising or reducing the amount of the assessment, the State Director will state in the record the reasons for such determination."); 43 C.F.R. § 3163.2(g) (similar). As Ponderosa concedes, those regulations give BLM "discretion" over when such requests should be granted. Ponderosa Br. 39. As such, the Court cannot review such a discretionary determination under the APA. 5 U.S.C. § 701(a)(2).

3. BLM did not err by applying a 2001 regulation to Ponderosa, who acquired the lease in 1997. *Contra* Ponderosa Br. 38. The Tenth Circuit has already rejected

Ponderosa's argument. *Compare id.* ("the governing 1988 rule provided that an assignor remained liable only for obligations that accrued before approval"), *with* *Monahan*, 2007 WL 2993577, at *6 n.7 ("We agree that the 1988 version was ambiguous as to the responsibility of the transferor. It spoke primarily to the obligations of the transferee.").

The Tenth Circuit also rejected Ponderosa's argument about the nature of the 2001 rule. Contrary to Ponderosa's claim that the "2001 Rule fundamentally changed the liability landscape," Ponderosa Br. 38, the Tenth Circuit held that "the 2001 amendment . . . was a clarifying amendment; it did not create a new category of liability," *Monahan*, 2007 WL 2993577, at *6.

4. BLM maintained an adequate bond at the time of assignment as it had no evidence to indicate that Wind River or its President might not fulfill their abandonment obligations. Contra Ponderosa Br. 39. Neither of those entities had previously been on the 17(g) list at the time of the assignment. Regardless, even if bond determinations surrounding the assignment approval were erroneous, that would only call into question the assignment approval, not any of the agency actions challenged here.

## IV. PONDEROSA'S SEVENTH AMENDMENT CLAIM FAILS.

The Constitution treats the two branches' adjudicatory powers differently. Article III of the Constitution reserves cases involving private rights—"the stuff of the traditional actions at common law tried by the courts at Westminster in 1789"—to courts alone. *SEC v. Jarkesy*, 603 U.S. 109, 128 (2024). By contrast, Articles I and II allow Congress to assign adjudications involving public rights—matters that "historically could have been determined exclusively by [the executive and legislative] branches"—to executive agencies, and such adjudications have been upheld for more than 170 years. *Id.* (alternation in original); *see also Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855). In those "distinctive areas," such as "the administration of public lands," agency adjudications of money penalties are well-established. *Jarkesy*, 603 U.S. at 120, 130.

### A. The Basis For The Civil Penalty Lies In Equity.

As the Supreme Court has explained, courts considering whether a suit is legal or equitable in nature must "consider the cause of action and the remedy it provides," with the remedy being the more important consideration. *Jarkesy*, 603 U.S. at 123. "[M]onetary relief can be legal or equitable." *Id.* "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Id.* (quoting *Tull*, 481 U.S. at 422).

Here, BLM ordered Ponderosa to perform an obligation of its oil and gas lease—plugging and abandoning the well it used for more than a decade of oil and gas production. That remedy is unavailable at common law and lies exclusively in equity. *See Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 459 (1977) ("specific performance was a remedy unavailable in a court of law and where such relief was sought the case would be tried in a court of equity with the facts as to making and breach to be ascertained by the court"). And the purpose of this remedy is "solely to 'restore the status quo,'" *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 422), by reclaiming the land disturbed by lease activity.

When Ponderosa refused to comply with that written order, BLM gave Ponderosa ample notice that it would ultimately face civil penalties under BLM's regulations if it continued to disobey this directive. *Supra* 18–21. BLM never imposed any monetary penalty on Ponderosa before giving it notice and an opportunity to avoid the penalty by coming into compliance. *Id.* And before being directed to pay daily penalties for its noncompliance, Ponderosa received at least four warnings, ample time to purge its noncompliance, and the opportunity to be heard by the State Director. *Id.*

Such purgeable penalties are neither punitive nor deterrent in nature; they are coercive or remedial. *See, e.g.*, *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624,

632 (1988) ("a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order"); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1443 (10th Cir. 1998) (*Law I*) ("Courts have upheld as civil fines intended to coerce, as long as the offending party can avoid them by complying with the court's order."); *see also Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1025, 1030 (*Law II*) (1998) ("As to the daily fines from May 4 until our stay order of May 7, the NCAA had the opportunity to avoid the sanctions by paying the attorneys' fee awards; thus this portion was coercive and civil."). "In civil contempt, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *In re Lucre Mgm't Group, LLC*, 365 F.3d 874, 876 (10th Cir. 2004) (citation modified ). Indeed, upon compliance with its orders to plug and abandon—even after civil penalties have been issued—BLM has waived those penalties after all work is completed to its satisfaction.

Ponderosa nonetheless asserts that the penalty is "plainly punitive" as "[i]t accrues at $13,343 per day, regardless of any loss to the government." Ponderosa Br. 41. To the contrary, the penalty initially accrued at the rate of $1,333 per day, before escalating to $13,343 per day following continued noncompliance. SDR0291. The Tenth Circuit has recognized that such escalating, purgeable, daily fines are

proper, coercive penalties. *Law II*, 134 F.3d at 1029-30 (upholding daily fines starting at $ 5,000, increasing to $ 10,000, for continued noncompliance). And BLM has substantial losses as, should Ponderosa and the other former record title owners fail to comply with their abandonment obligations, BLM and the taxpayers will ultimately bear responsibility to complete reclamation work anticipated to cost $300,000. SDR0253.

Ponderosa notably fails to identify any triable jury issue. Questions of law, such as the meaning of a statute or lease term, would not be submitted to a jury. And "a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action." *Tull v. United States*, 481 U.S. 412, 427 (1987).

The nature of the dispute likewise demonstrates that the civil penalty lies in equity. In England, claims involving crown lands were brought in the court of equity in the exchequer chamber. 4 William Blackstone & St. George Tucker, Blackstone's Commentaries 43–4 (1803) ("The primary and original business of this court is to call the king's debtors to account by bill filed by the attorney general; and to recover any lands, tenements, or hereditaments, any goods, chattels, or other profits or benefits, belonging to the crown."). Suits to recover benefits belonging to public lands, such as reclamation obligations, thus lie at equity.

Ponderosa incorrectly asserts that, because "the source of the underlying obligation that purportedly gives rise to the penalties is a lease, which is a contract – a classic common-law subject," any claims concerning that lease "must be tried to a jury." Ponderosa Br. 48. To the contrary, contract disputes with the government are heard in the Court of Federal Claims. *E.g.*, 28 U.S.C. § 1491; 28 U.S.C. § 1503; 41 U.S.C. § 7104(b)(1). It has been settled law for nearly 150 years that the Seventh Amendment does not apply to such suits. *McElrath v. United States*, 102 U.S. (12 Otto) 426, 440 (1880) ("Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defence, or to any set-off or, counter-claim which the government may assert, are not controlled by the Seventh Amendment. They are not suits at common law within its true meaning.").

**B. Even If The Civil Penalty Lies At Common Law, The Public Rights Exception Applies.**

In *Jarkesy*, the Supreme Court recognized a class of cases concerning "public rights," for which "no involvement by an Article III court in the initial adjudication is necessary." 603 U.S. at 128. Such cases involve areas where "the political branches had traditionally held exclusive power over [a] field," such as revenue collection, immigration, tariffs, relations with Indian tribes and granting public benefits. *Id.* at 128–130. Relevant here, the Supreme Court recognized "administration of public lands" as a category of adjudications that fell within the public rights exception. *Id.* at 130 (citing *Crowell v. Benson*, 285 U.S. 22, 51 (1932));

*see also Ex parte Bakelite Corp.*, 279 U.S. 438, 456 (1929) (discussing legislative Court of Private Land Claims). Because this case plainly involves the administration of public lands, the Court could simply cite that line from *Jarkesy* to deny Ponderosa's Seventh Amendment claim.

Ponderosa attempts to narrow *Jarkesy* from "administration of public lands" to "disposition of public lands" and then claims that this adjudication involves no such disposition. Ponderosa Br. 46–48. This court need not decide the proper scope of the exception here, because—even if Ponderosa is correct that it only applies to disposition of public lands—it would still not prevail as leases dispose of interests in public lands. *Lee's Ford Dock, Inc. v. Sec'y of the Army*, 865 F.3d 1361, 1367 (Fed. Cir. 2017). And BLM's adjudication of outstanding obligations under that lease is precisely the sort of judgment that has long been entrusted to the Executive Branch. "It has undoubtedly been affirmed, over and over again, that, in the administration of the public-land system of the United States, questions of fact are for the consideration and judgment of the land department, and that its judgment thereon is final." *Burfenning v. Chi., St. P., M. & O. Ry. Co.*, 163 U.S. 321, 323 (1896).

The Constitution grants Congress plenary "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2.; *Kleppe v. New Mexico*, 426

U.S. 529, 539–41 (1976). Through the MLA, Congress has delegated that responsibility to the Department of the Interior for disposing of federal mineral interests. And it empowered Interior to grant leases that "provide for resort to appropriate methods for the settlement of disputes or for remedies for breach of specified conditions thereof." 30 U.S.C. § 188(a).

Based on longstanding regulatory enforcement mechanisms, BLM has leased 22 million acres of federal mineral estate, with over 91,000 wells on over 23,500 producing oil and gas leases.[13] If a jury trial is now required to enforce BLM's plugging and reclamation requirements, the federal oil and gas program will be thrown into disarray. And given the nearly 11,000 federal leases covering 6.7 million acres of land in Wyoming,[14] the Court would be similarly deluged by jury demands. Because imposing a civil penalty for failing to plug and abandon a well is constitutional for the reasons discussed above, the Court should reject Ponderosa's Seventh Amendment Claim.

## CONCLUSION

For the foregoing reasons, Respondents respectfully request that the Court deny any relief to Petitioners.

---

[13] https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about

[14] https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/wyoming

Submitted respectfully this 7th day of October, 2026,

ADAM R.F. GUSTAFON
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division
United States Department of Justice

/s/ Michael S. Sawyer
MICHAEL S. SAWYER
Senior Attorney, Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-5273
Fax: (202) 305-0506
Email: michael.sawyer@usdoj.gov

DARIN D. SMITH
United States Attorney

/s/ C. Levi Martin
C. LEVI MARTIN (WY Bar #6-3781)
Civil Chief
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
christopher.martin@usdoj.gov

*Counsel for Respondents*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(B), I certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(i) because it contains 12,805 words, excluding the parts of the briefs exempted by Rule 32(f).