Danielle DiMauro (*pro hac vice*)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
1401 Lawrence Street, Suite 1800
Denver, Colorado 80202
Telephone: 303-830-2500
Facsimile: 303-832-2366
ddimauro@wsmtlaw.com

Hampton K. O'Neill (Wyoming Bar No. 5-2876)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
159 North Wolcott, Suite 220
Casper, Wyoming 82601
Telephone: 307-234-6907
Facsimile: 307-234-6908
honeill@wsmtlaw.com

*Attorneys for Petitioner*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| PONDEROSA RESOURCES CORPORATION,<br>Petitioner,<br><br>v.<br><br>THE UNITED STATES BUREAU OF LAND MANAGEMENT, ANDREW ARCHULETA, in his official capacity as Wyoming State Director for the U.S. Bureau of Land Management, and THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Respondents. | Civil Case No. 1:24-cv-00141-SWS |

**PETITIONER'S CONSOLIDATED REPLY
IN SUPPORT OF ITS OPENING BRIEF**

## TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................1

II. CONGRESS'S 1946 AMENDMENTS WERE DESIGNED TO ENCOURAGE DRILLING AND ASSIGNMENTS—NOT TO SADDLE ASSIGNORS WITH SUCCESSORS' FUTURE COSTS. ............................2

III. 43 C.F.R. § 3106.7-2(b) EXCEEDS BLM'S STATUTORY AUTHORITY AND MUST BE SET ASIDE. ......................................................................4

A. The Ordinary Meaning of "Accrue" Confirms the Obligation Is Not Enforceable Until BLM Determines the Well Cannot Produce...........4

B. Section 187b Shows Congress Knew How to Address Well-Condition Obligations Expressly—and Chose Not to in Section 187a. ................8

C. Section 187a Supersedes the Common-Law Rule, and *Monahan* Does Not Hold Otherwise.....................................................................10

D. Sections 189, 226(g), and BLM's Bonding Regulations Do Not Authorize the 2001 Rule. ..........................................................14

E. Policy Concerns and Analogies to Other Statutes Cannot Override Section 187a. .........................................................................16

IV. BLM'S ENFORCEMENT AGAINST PONDEROSA WAS ARBITRARY, CAPRICIOUS, AND BASED ON THE WRONG REGULATION...........18

V. PONDEROSA'S CLAIMS ARE TIMELY. ..............................................20

A. Section 226-2 Does Not Apply. ......................................................20

B. Even if Section 226-2 Applies, This Action is Timely Because BLM's Civil Penalty Order was the Final Agency Action Related to the Matter ..........................................................................................22

C. Even if Section 226-2 Applies to the SDR Decision, This Action is Timely..............................................................................................26

D. In Any Event, A Timely Challenge to the Civil Penalty Order Permits Review of the Predicate Liability Determination and the Seventh Amendment Claim. ......................................................................29

VI. THE SEVENTH AMENDMENT BARS BLM'S ADMINISTRATIVE IMPOSITION OF CIVIL PENALTIES. .....35

VII. CONCLUSION.....39

CERTIFICATE OF COMPLIANCE.....40

CERTIFICATE OF SERVICE .....41

# TABLE OF AUTHORITIES

## Constitutional Provisions

Seventh Amendment to the U.S. Constitution ........ 2, 36, 37

## Statutes

5 U.S.C. § 704 ........ 23, 27

28 U.S.C. § 1331 ........ 31

28 U.S.C. § 2401(a) ........ 22

28 U.S.C. § 2462 ........ 23

30 U.S.C. § 187a ........ passim

30 U.S.C. § 187b ........ 1, 8, 9

30 U.S.C. § 189 ........ 15

30 U.S.C. § 226(g) ........ 3, 14, 15

30 U.S.C. § 226-2 ........ passim

30 U.S.C. § 1719 ........ 32

30 U.S.C. § 1719(e) ........ 32, 33

30 U.S.C. § 1719(j) ........ 23, 32, 38

43 U.S.C. § 1334(a)(3) ........ 15

43 U.S.C. § 1334(b) ........ 15

Act of Aug. 8, 1946, ch. 916, §§ 7–8, 60 Stat. 950, 955–56 ........ 2

P.L. 86-705, 74 Stat. 781 (Sept. 2, 1960) ........ 20

## Regulations

30 C.F.R. § 250.1701(a) ........ 17

43 C.F.R. § 4.21 ....27

43 C.F.R. § 4.21(a) (2024) ....27

43 C.F.R. § 4.21(a)(2) ....27

43 C.F.R. § 4.21(c) (2024) ....27

43 C.F.R. § 4.411(a)(2)(i) (2024) ....28

43 C.F.R. § 4.5 ....25

43 C.F.R. § 3104.50 ....14

43 C.F.R. § 3106.60 ....14

43 C.F.R. § 3106.7-2 (1988) ....17

43 C.F.R. § 3106.7-2(b) ....18

43 C.F.R. § 3106.7-2(b) (2001) .... passim

43 C.F.R. § 3106.72(b) (2024) ....1, 39

43 C.F.R. § 3106.7-6(a) ....18

43 C.F.R. § 3162.3-4(a) ....5, 24

43 C.F.R. §§ 3163.1-.2 ....24

43 C.F.R. § 3171.25(a) ....24

**Rules**

Fed. R. Civ. P. 6 ....26

**Cases**

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991) ....11

*Axon Enterprise, Inc. v. FTC*,
598 U.S. 175 (2023) .... passim

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ....................................................................................9

*B-B Co. v. Piper Jaffray & Hopwood, Inc.*,
931 F.2d 675 (10th Cir. 1991)....................................................................5

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................ 23, 25, 26, 29

*Boechler, P.C. v. Comm'r of Internal Revenue*,
596 U.S. 199 (2022) ........................................................................ 31, 32

*Burfenning v. Chi., St. P., M. & O. Ry. Co.*,
163 U.S. 321 (1896) ..................................................................................38

*Carr v. Saul*,
593 U.S. 83 (2021) ....................................................................................35

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ..................................................................................11

*Chissoe v. Zinke*,
725 F. App'x 614 (10th Cir. 2018)............................................................33

*City Bank Farmers Tr. Co. v. Irving Tr. Co.*,
299 U.S. 433 (1937) ....................................................................................6

*City of El Paso v. Simmons*,
379 U.S. 497 (1965) ....................................................................................7

*Colo. Gas Compression, Inc. v. Comm'r,*
366 F.3d 863 (10th Cir. 2004)....................................................................9

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ............................................................ 22, 23, 30, 32

*Cotonificio Bustese, S.A. v. Morgenthau*,
121 F.2d 884 (D.C. Cir. 1941)..................................................................19

*Coyote Portable Storage, LLC v. PODS Enters., Inc.*,
618 F. App'x 525 (11th Cir. 2015)..............................................................6

*Crowell v. Benson*,
285 U.S. 22 (1932) ....................................................................................37

*Crown Coat Front Co. v. United States*,
386 U.S. 503 (1967) ..................................................................................26

*Darby v. Cisneros*,
509 U.S. 137 (1993) ..................................................................................29

*Devon Energy Corp.*,
IBLA 2021-0132 (2026)..................................................................................5

*FCC v. AT&T, Inc.*,
608 U.S. 531 (2026) ..................................................................................38

*FERC v. Vitol Inc.*,
79 F.4th 1059 (9th Cir. 2023)......................................................................23

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,
561 U.S. 477 (2010) .......................................................................... 34, 35

*Functional Music, Inc. v. FCC,*
274 F.2d 543 (D.C. Cir. 1958)......................................................................30

*Geosearch, Inc. v. Andrus,*
494 F. Supp. 978 (D. Wyo. 1980) ................................................................28

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33 (1989) ....................................................................................37

*Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*,
940 F.3d 498, 504, 510-511 (10th Cir. 2019)..................................................25

*Helvering v. Russian Fin. & Constr. Corp.*,
77 F.2d 324 (2d Cir. 1935) ..........................................................................6

*Honeyman v. Jacobs*,
306 U.S. 539 (1939) ....................................................................................7

*Impact Energy Resources, LLC v. Salazar*,
693 F.3d 1239 (10th Cir. 2012).......................................................... 25, 32

*In re Furr's Supermarkets, Inc.*,
283 B.R. 60 (B.A.P. 10th Cir. 2002) .......................................................................7

*In re Sixty Seven Thousand Four Hundred Seventy Dollars ($67,470.00)*,
901 F.2d 1540, 1544 (11th Cir. 1990) ....................................................................19

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
512 U.S. 821 (1994) ................................................................................................36

*Jarkesy v. SEC*,
803 F.3d 9 (D.C. Cir. 2015).....................................................................................34

*Kane County, Utah v. United States,*
772 F.3d 1205 (10th Cir. 2014) ..............................................................................32

*Karis Oil Co.*,
58 IBLA 123 (1981) ....................................................................................... 14, 17

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ...................................................................................... passim

*Loughrin v. United States,*
573 U.S. 351 (2014) ..................................................................................................9

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ................................................................................................29

*Marathon Oil Co. v. Andrus*,
452 F. Supp. 548 (D. Wyo. 1978) .............................................................................3

*Mariner Energy, Inc. v. Devon Energy Prod. Co.*,
517 F. App'x 226 (5th Cir. 2013)...............................................................................7

*Mariner Energy, Inc. v. Devon Energy Prod. Co.*,
690 F. Supp. 2d 558 (S.D. Tex. 2010)........................................................................7

*McCormick v. HRM Res., LLC,*
No. 1:24-CV-00823-CNS-CYC, 2025 WL 90148 (D. Colo. Jan. 14, 2025).....5, 6

*McElrath v. United States,*
102 U.S. 426 (1880) ................................................................................................37

*McEvoy v. Diversified Energy Co.*,
No. 5:22-CV-171, 2023 WL 2808469 (N.D.W. Va. Apr. 4, 2023) ........................6

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025) .......................................................................... 30, 32, 33

*Michigan v. EPA*,
576 U.S. 743 (2015) ..........................................................................................18

*Monahan v. U.S. Department of the Interior*,
No. 05-8068, 2007 WL 2993577 (10th Cir. Oct. 15, 2007).......................... 11, 12

*Motor Vehicle Mfrs Ass'n. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ......................................................................................... 18, 19

*Nat'l Parks & Conservation Ass'n v. BLM*,
606 F.3d 1058 (9th Cir. 2010).............................................................................27

*Pan Am. Petroleum Corp. v. Gibbons*,
168 F. Supp. 867 (D. Utah 1958) .......................................................................10

*Park Cnty. Res. Council, Inc. v. U.S. Dep't of Agric.*,
817 F.2d 609 (10th Cir. 1987).............................................................................21

*Phoenix Energy One, LLC v. Kraken Oil & Gas, LLC*,
No. CV 25-65-BLG-TJC, 2026 WL 2390834 (D. Mont. Aug. 17, 2026) ...........22

*R.E. Puckett*,
124 IBLA 288 (1992) ..................................................................................... 14, 17

*Russello v. United States,*
464 U.S. 16 (1983) ................................................................................................9

*Sackett v. EPA,*
566 U.S. 120 (2012) ............................................................................................24

*Scarabin v. Drug Enf't Admin.*,
919 F.2d 337 (5th Cir. 1990)...............................................................................19

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................................................18

*SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 35, 37

*SEC v. Mohn,*
465 F.3d 647 (6th Cir. 2006) .......... 23

*Statoil USA E&P Inc. v. U.S. Dep't of the Interior*,
2017 WL 7053924 (S.D. Tex. Sept. 29, 2017) .......... 23

*Sturges v. Crowninshield*,
17 U.S. 122 (1819) .......... 7

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 33

*Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*,
824 F. App'x 197 (5th Cir. 2020) .......... 6, 7

*Tull v. United States*,
481 U.S. 412 (1987) .......... 35, 36, 37, 38

*United States v. Anderson*,
269 U.S. 422 (1926) .......... 6

*United States v. Carrizales-Toledo,*
454 F.3d 1142 (10th Cir. 2006) .......... 25

*United States v. Conway*,
25 F. Cas. 598 (D. Ark. 1843) .......... 7

*United States v. I-44 Truck Ctr. & and Wrecker Serv., LLC*,
180 F.4th 1091 (8th Cir. 2026) .......... 23, 24

*United States v. Lindsay*,
346 U.S. 568 (1954) .......... 4

*United States v. Meyer,*
808 F.2d 912 (1st Cir. 1987) .......... 23

*United States v. Texas,*
507 U.S. 529 (1993) .......... 11

*United States v. Tr No. B.I. 35, Bank of Am. Nat'l Tr. & Sav. Ass'n*, 107 F.2d 22 (9th Cir. 1939) .......... 3

*United States v. Wong*, 575 U.S. 402 (2015) .......... 31

*Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) .......... 21

*Von Hoffman v. City of Quincy*, 71 U.S. 535 (1866) .......... 7

*Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142 (D.C. Cir. 2014) .......... 30

*Wilkins v. United States,* 598 U.S. 152 (2023) .......... 31, 32

*Wyoming v. U.S. Dep't of the Interior*, No. 22-CV-247-SWS, 2024 WL 5264647 (D. Wyo. Dec. 31, 2024) .......... 21, 22

**Federal Register References**

11 Fed. Reg. 12956 (Nov. 1, 1946) .......... 13

90 Fed. Reg. 2332 (Jan. 10, 2025) .......... 29

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .......... 4

Restatement (Second) of Contracts § 225 (Am. L. Inst. 1981) .......... 5

S. Rep. No. 79-1392 (1946) .......... 2, 3, 9, 13

S. Rep. No. 86-1549, 1960 U.S.C.C.A.N. 3313 (June 10, 1960) .......... 20

Petitioner Ponderosa Resources Corporation ("Ponderosa") submits this consolidated reply to the opposition briefs filed by Intervenor-Respondent Conservation Groups ("Intervenors") (ECF 73) and the Federal Respondents ("Respondents") (ECF 75).

## I. INTRODUCTION

Both Intervenors and Respondents defend 43 C.F.R. § 3106.7-2(b) (2001) (the "2001 Rule") and its successor, 43 C.F.R. § 3106.72(b) (2024) (the "2024 Rule"), and Respondents defend BLM's enforcement against Ponderosa. ECF 73 at 3; ECF 75. But neither answers the question presented: what Congress meant when it released an assignor from "all obligations thereafter accruing" in Section 187a of the Mineral Leasing Act ("MLA"), 30 U.S.C. § 187a. Instead, both rest on the premise that a plugging obligation for a producing well "accrues" when the well is drilled, even though, as Intervenors concede, it is "not yet enforceable" at that time. ECF 73 at 5.

Congress's purpose in enacting Section 187a—encouraging assignments while protecting the United States by requiring appropriate bonds—forecloses that premise. *See infra*, Part II. The text of Section 187a confirms Congress's purpose. *See infra*, Part III. Section 187b, Section 187a, and the MLA's bonding provisions all confirm Ponderosa's reading of Section 187a. *See infra*, Part III. Because the 2001 and 2024 Rules redefine "accrued" to reach duties that arise only after an

assignment is approved, both exceed BLM's statutory authority and must be set aside. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 412–13 (2024).

Even if the rules stood, BLM's enforcement against Ponderosa independently fails. *See infra*, Part IV. BLM sought to shift the approved successors' shortfall back to Ponderosa despite having released Ponderosa's bond, refused to consider Ponderosa's compromise requests, and relied on the wrong regulation. *See* Petitioner's Opening Brief, ECF 67 ("Pet. Br.") at 38–51.

Ponderosa's claims are also timely. *See infra*, Part V. Finally, the Seventh Amendment independently bars BLM's administrative imposition of civil penalties on Ponderosa. See *infra*, Part VI.

## II. CONGRESS'S 1946 AMENDMENTS WERE DESIGNED TO ENCOURAGE DRILLING AND ASSIGNMENTS—NOT TO SADDLE ASSIGNORS WITH SUCCESSORS' FUTURE COSTS.

Section 187a should be read in light of the purpose of the 1946 amendments to the Mineral Leasing Act, which Congress enacted "to promote the development of oil and gas on the public domain." Act of Aug. 8, 1946, ch. 916, §§ 7–8, 60 Stat. 950, 955–56. The Senate Committee explained that the Nation needed to "develop our petroleum reserves to the utmost" and that the amendments were designed to "eliminate much of the delay now incident to assignments or other transfer of leases" and "permit the free relinquishment of leases." S. Rep. No. 79-1392, at 1, 3 (1946). As one court observed, the 1946 amendments were intended "to encourage and

stimulate the discovery of new petroleum reserves and the development of known petroleum reserves." *Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 551 (D. Wyo. 1978). *See also* S. Rep. No. 79-1392, at 9.

Section 187a advances that objective by making transfers of leases to those most willing and able to develop them more efficient and predictable. Upon approval, the assignee is bound "to the same extent as if such assignee . . . were the original lessee," while the assignor is "release[d] and discharge[d] . . . from all obligations thereafter accruing." 30 U.S.C. § 187a. Congress further directed that assignments be approved promptly and generally authorized disapproval only for lack of assignee qualification or an insufficient bond. *Id.*; *see also* 30 U.S.C. § 226(g).

Respondents' contrary interpretation would frustrate that congressional design. Once an assignment is approved, the assignee may decide to deepen, side-track, recomplete or modify existing wells, which can materially increase the costs of eventual plugging. In the period leading up to the 1946 amendments, for example, deepening existing wells to new formations was a well-known and growing practice.[1] Yet under Respondents' interpretation, the assignor would remain liable

[1] *See, e.g., United States v. Tr No. B.I. 35, Bank of Am. Nat'l Tr. & Sav. Ass'n,* 107 F.2d 22, 25 (9th Cir. 1939) (taking judicial notice of "the great increase in depth in practical drilling in the last thirty years"); S. Rep. No. 79-1392, at 10 (Interior's concern about a lessee having "no opportunity to sink his wells to some deeper horizon" when production from a particular zone is depleted).

for obligations generated by operational decisions it neither made nor controlled, potentially decades after it ceased holding the lease. That construction would burden assignors with indefinite and unquantifiable exposure, discouraging the transfers Congress sought to encourage.

If that legislative choice leaves policy gaps, the remedy lies with Congress, not with a regulation that redefines a statutory term. *See United States v. Lindsay*, 346 U.S. 568, 571 (1954) (declining to "stretch the word 'accrued' beyond its ordinary meaning" and leaving the "statutory problem with Congress").

## III. 43 C.F.R. § 3106.7-2(b) EXCEEDS BLM'S STATUTORY AUTHORITY AND MUST BE SET ASIDE.

### A. The Ordinary Meaning of "Accrue" Confirms the Obligation Is Not Enforceable Until BLM Determines the Well Cannot Produce.

Intervenors' argument depends on a distinction between an obligation's "accrual" and its later "ripening." ECF 73 at 5. Section 187a contains no such distinction, and the ordinary meaning of "accrue" cuts the other way. In 1946, as now, "accrue" meant "to come into existence as an enforceable claim or right." Pet. Br. at 27 (quoting Black's Law Dictionary (12th ed. 2024)). Intervenors offer no competing definition.

BLM's own regulations confirm that a plugging obligation for a producing well only accrues after BLM determines the well can no longer produce in paying quantities and approves or prescribes a plugging plan. 43 C.F.R. § 3162.3-4(a).

Intervenors effectively concede the point by arguing only that every producing well will eventually cease production. ECF 73 at 7. An obligation of unknown scope and cost that will arise at some future time, however, is not a present accrued obligation.

The Respondents' cited dictionary definitions lead to the same result. Their "primary" 1946 meaning of "accrue" describes something that accumulates or attaches over time, such as interest on a debt—not a single, conditional duty that is unknown in scope or cost until the duty to perform is triggered. ECF 75 at 33–34. Their alternative definition, "to arise, to happen, to come into force or existence; to vest," supports Ponderosa. ECF 75 at 34. A duty subject to an unfulfilled condition precedent has not accrued. Restatement (Second) of Contracts § 225 (Am. L. Inst. 1981); *B-B Co. v. Piper Jaffray & Hopwood, Inc.*, 931 F.2d 675, 678 (10th Cir. 1991).

Intervenors rely on *Devon Energy Corp.*, ECF 73 at 17-18, in which the Interior Board of Land Appeals ("IBLA") distinguished rentals and royalties because they "accrue periodically," whereas decommissioning obligations do not. IBLA 2021-0132, slip op. at 13 (2026). But *Devon* construed offshore lease language, not Section 187a, and was expressly nonprecedential. And *McCormick v. HRM Res., LLC,* No. 1:24-CV-00823-CNS-CYC, 2025 WL 90148, at *5 (D. Colo. Jan. 14, 2025) does not aid Intervenors. ECF 73 at 16. The use of "or" in the quoted phrase

(recognizing an "obligation on the part of the operator **or its successor**") does not imply joint liability.

Courts applying the 1946-era understanding of accrual consistently held that an obligation accrues only when it becomes fixed and unconditional. *See United States v. Anderson*, 269 U.S. 422, 441 (1926) (obligation accrues when "all the events" have occurred that "fix the amount" and "determine the liability" of the obligor); *Helvering v. Russian Fin. & Constr. Corp.*, 77 F.2d 324, 327 (2d Cir. 1935) ("[w]hen, however, the obligation to pay is contingent upon the happening of some future event, . . . no obligation accrues"). The same principle appeared in lease law: future rent does not accrue until the time for payment arrives. *City Bank Farmers Tr. Co. v. Irving Tr. Co.*, 299 U.S. 433, 437 (1937). A plugging obligation conditioned on a future BLM determination is no different.

Respondents' cases do not hold otherwise. *Coyote Portable Storage, LLC v. PODS Enters., Inc.*, 618 F. App'x 525, 533-34 (11th Cir. 2015), recognized an obligation accrues based on when performance is due, holding payments due for periods after the release were obligations accruing after the release, although the agreement creating the payment duty had been signed years earlier. *McEvoy v. Diversified Energy Co.*, No. 5:22-CV-171, 2023 WL 2808469 (N.D.W. Va. Apr. 4, 2023) construed Alabama law in the context of a fraudulent transfer claim. *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, 824 F. App'x 197, 205-206 (5th

Cir. 2020) and *Mariner Energy, Inc. v. Devon Energy Prod. Co.*, 690 F. Supp. 2d 558, 564 (S.D. Tex. 2010), *aff'd*, 517 F. App'x 226 (5th Cir. 2013) applied offshore regulations—confirming regulatory choice, not the ordinary meaning of the statutory term "accrue." *United States v. Conway*, 25 F. Cas. 598, 598 (D. Ark. 1843), like the collected cases cited in *City of El Paso v. Simmons*, 379 U.S. 497, 503 (1965), addressed the distinction between contract obligation and remedy in the context of legislative modification of a remedy, not the timing of accrual. *See Sturges v. Crowninshield*, 17 U.S. 122, 200 (1819); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 553-54 (1866); *Honeyman v. Jacobs*, 306 U.S. 539, 544-45 (1939). And the arguments Respondents make regarding *In re Furr's Supermarkets, Inc.*, 283 B.R. 60, 70 (B.A.P. 10th Cir. 2002), rest on the bankruptcy code, not Section 187a. ECF 75 at 36-37.

No court has construed 30 U.S.C. § 187a to hold that plugging obligations accrue when a well is drilled, and decisions applying statutes and regulations from other regimes cannot supply the meaning of this statutory term after *Loper Bright*. 603 U.S. at 412–13.

### B. Section 187b Shows Congress Knew How to Address Well-Condition Obligations Expressly—and Chose Not to in Section 187a.

The Respondents' principal textual argument is that the requirements under 30 U.S.C. § 187b show that "continuing" plugging obligations accrue when a well is drilled. ECF 75 at 31–32. Section 187b proves the opposite.

Section 187b applies only to relinquishment, when no successor acquires the lease. In that circumstance, Congress preserved two distinct obligations: (1) payment of "accrued rentals and royalties," and (2) placing wells "in condition for suspension or abandonment." 30 U.S.C. § 187b. Congress modified the first obligation with the term "accrued" but not the second. If well-abandonment obligations automatically accrued upon drilling, no separate reference to wells would have been necessary.

Section 187b further confirms that Congress did not view plugging and abandonment as an obligation that accrued upon drilling. Congress did not require a relinquishing lessee to plug every well; it could instead place a well in "condition for suspension," allowing the government to re-lease the property and a new lessee to rework, deepen, or return the well to production. Contrary to Respondents' assertion, Section 187b's reference to a "continued" obligation does not preserve future plugging liability in a former lessee. ECF 75 at 31-32. It simply requires that existing wells be placed "in condition for suspension or abandonment" before

release; once that condition is satisfied, the lessee is released from "all obligations thereafter accruing."

The textual difference between the provisions makes sense. Upon relinquishment, no successor assumes responsibility, so Congress required the relinquishing lessee to address the condition of existing wells. In contrast, an approved assignee, backed by a bond approved by the Secretary, assumes the lease obligations "as if [it] were the original lessee." 30 U.S.C. § 187a.

The legislative history confirms as much: the Senate Committee described the well requirement in Section 187b as a "necessary condition[] precedent" to the release of the lessee's bond. S. Rep. No. 79-1392, at 3.

Having expressly preserved a well-condition obligation in Section 187b, Congress's omission of comparable language from Section 187a in the same legislation is best understood as deliberate. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983); accord *Colo. Gas Compression, Inc. v. Comm'r,* 366 F.3d 863, 867-68 (10th Cir. 2004). That presumption is especially strong where the contrasting provisions are adjacent. *Loughrin v. United States,* 573 U.S. 351, 358 (2014); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-53 (2002).

The 2001 Rule's theory that plugging obligations accrue when a well is drilled cannot be reconciled with the statutory framework.

### C. Section 187a Supersedes the Common-Law Rule, and *Monahan* Does Not Hold Otherwise.

Respondents invoke the common-law rule that ordinarily, an assignor remains secondarily liable after assignment. ECF 75 at 39-45. The corollary is that the contracting parties may displace such secondary liability by agreement. Pet. Br. at 21. Ponderosa does not dispute the background principle; but Congress negated it by providing that, upon approval, the assignee is bound "to the same extent as if such assignee were the original lessee, any conditions in the assignment to the contrary notwithstanding," and that approved assignments "shall relieve and discharge the assignor . . . from any obligation thereafter accruing." 30 U.S.C. § 187a. Congress thus supplied the agreement to the contrary, negating the common-law default rule. *See Pan Am. Petroleum Corp. v. Gibbons*, 168 F. Supp. 867, 872 (D. Utah 1958) (recognizing that approval substitutes the assignee as the obligor under the lease). Indeed, Respondents concede that Section 187a's release applies at least to partial assignments, ECF 75 at 43-45, which Congress stated applies to assignments "as above provided." 30 U.S.C § 187a. The dispute is therefore not whether Section 187a displaces the common law, but what obligations "thereafter accru[e]."

Respondents also overstate the governing standard. Congress need not expressly repudiate a common-law rule; it need only "speak directly" to the question

addressed by the common law. *United States v. Texas,* 507 U.S. 529, 534 (1993); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Section 187a does exactly that by releasing the assignor from obligations "thereafter accruing" and binding the assignee "as if" it were the original lessee. Applying a rule of continuing assignor liability to post-approval obligations would nullify the statutory release.

Nor does *Monahan v. U.S. Department of the Interior*, No. 05-8068, 2007 WL 2993577 (10th Cir. Oct. 15, 2007), resolve this case. The court emphasized that a sublease of operating rights "does not . . . affect the relationship imposed by a lease between the lessee and the United States" and held only that the sublessor therefore remained liable as the record-title owner. *Id.* at *4.[2] Ponderosa, by contrast, did not enter a sublease but assigned all record title and operating rights, and BLM approved those assignments and released Ponderosa's bond.

*Monahan* was also decided under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The court stated that Congress had not spoken clearly to the issue before it and deferred to the agency's interpretation. *Id.* at *2-*4. After *Loper Bright*, courts may not defer to an agency's statutory

[2] *Monahan*'s ruling that a lease's incorporation of regulations "now or hereafter in force" subjects lessees to later regulatory changes, 2007 WL 2993577, at *5, does not answer Ponderosa's statutory challenge; such a clause incorporates only valid regulations.

interpretation merely because a statute is ambiguous. 603 U.S. at 412-13. In any event, *Monahan* did not decide whether a future plugging obligation "accrued" before approval of an assignment under Section 187a.

*Monahan* in fact supports Ponderosa's position. The court explained that BLM does not closely scrutinize transfers of operating rights because the original lessee remains liable, unlike transfers of record title. 2007 WL 2993577, at *7. That distinction is consistent with Section 187a: once record title is assigned and the assignment approved, the assignee becomes the party answerable to the Government. BLM's failure to require adequate bonding from successors cannot override Congress's command that approved assignments "release and discharge" the assignor.

Finally, Respondents attempt to create an artificial distinction between partial and full assignments and explain away the phrase "as above provided" to mean procedural "steps" such as "filing in triplicate." ECF 75 at 43-45. This ignores the statutes' text, context, and purpose. Section 187a provides that "[a]ny partial assignment of any lease **shall** segregate the assigned and retained portions thereof, **and as above provided, release and discharge the assignor** from all obligations thereafter accruing with respect to the assigned lands." (Emphasis Added). The phrase "as above provided" directly relates to the word "release" which follows, not to procedural steps.

The Departmental policy Respondents cite, ECF 75 at 44, concerns the separate provision extending the primary term of segregated leases for two years. S. Rep. No. 79-1392, at 9 (1946); *see also id.* at 15. Nothing in Section 187a, however, limits partial assignments to undeveloped lands.

Similarly, BLM's contemporaneous regulation allowing (but not requiring) joint-liability bond arrangements in full assignments provides no insight into Congress's intent to release an assignor. ECF 75 at 43. The regulation merely allowed the parties to keep using the existing bond "if the assignment so provides," *i.e.*, by agreement. 11 Fed. Reg. 12956, 12962 (Nov. 1, 1946).

Congress sought to facilitate assignments "as to all or part of the acreage included therein," regardless of the state of development, S. Rep. No. 79-1392, at 15, and it released assignors from later-accruing obligations under both kinds of assignment. Congress could not rationally have intended to release the assignor when a partial assignment creates a segregated lease, yet deny that release when the new record title owner later assigns that segregated lease in full. Both kinds of assignments transfer leases to those best able to develop them, advancing Congress's stated goal of developing the nation's petroleum reserves "to the utmost." S. Rep. No. 79-1392, at 1, 3. Respondents' construction of Section 187a to the contrary conflicts with the plain language of the statute and Congress's intent.

### D. Sections 189, 226(g), and BLM's Bonding Regulations Do Not Authorize the 2001 Rule.

Intervenors contend that § 226(g)'s requirement that a bond be posted before surface-disturbing activities begin shows that plugging obligations attach when a well is drilled. ECF 73 at 9-10. But Section 226(g) requires financial assurance to secure reclamation and restoration obligations that arise "after the abandonment or cessation of oil and gas operations." 30 U.S.C. § 226(g). The current operator or lessee must post a bond because the obligation is future and contingent, not because it has already accrued.

The statutory scheme identifies who bears that future obligation. Section 187a conditions approval of an assignment on the assignee furnishing a sufficient bond, and BLM's regulations require the assignee to provide bonding covering lease obligations to the same extent as the assignor's bond and allow BLM to increase the required bond. 43 C.F.R. §§ 3106.60, 3104.50. Consistent with that framework, the IBLA has long recognized that once an assignment is approved, responsibility passes to the assignee and its surety. *See, e.g., R.E. Puckett*, 124 IBLA 288, 292 (1992); *Karis Oil Co.,* 58 IBLA 123, 124-25 (1981). Here, BLM released Ponderosa's bond. SDR0426; Pet. Br. at 14.

Intervenors' argument that predecessor liability is a necessary backstop if a successor's bond proves inadequate, ECF 73 at 10, would make former lessees guarantors of their successors' performance, precisely what Section 187a forbids.

Congress assigned that risk to BLM's bonding authority and did not authorize BLM to shift it back to former lessees.

The Respondents' reliance on Sections 189 and 226(g) fares no better. ECF 75 at 37. Those provisions authorize BLM to prescribe bonding requirements and other implementing regulations; they do not authorize BLM to redefine when an obligation "accrues" or to narrow the release Congress enacted in Section 187a. An agency may "fill up the details" of a statutory scheme, but it has no authority to rewrite the statutory allocation of liability. *See Loper Bright,* 603 U.S. at 395, 412-13. Indeed, Respondents acknowledge that BLM considered increasing bond amounts and declined to do so. ECF 75 at 38. That was a policy choice not to use the tool Congress provided.

Unlike 43 U.S.C. § 1334(a)(3) and (b), which grant the Secretary broad authority to adopt and amend regulations at any time "as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf" and specifically governing "the assignment or relinquishment of a lease," the MLA confers on the Secretary only general authority to prescribe "necessary and proper" regulations to carry out "the purpose" of the MLA, 30 U.S.C. § 189. That provision does not allow BLM to impose continuing assignor liability contrary to Congress's express release in Section 187a.

### E. Policy Concerns and Analogies to Other Statutes Cannot Override Section 187a.

Intervenors lead with policy, arguing that every well will eventually require plugging, prior lessees benefited from production and can protect themselves through private arrangements, and continuing liability mitigates moral hazard. ECF 73 at 1-3, 6-8, 18. Those arguments belong before Congress. The question under the APA is whether BLM acted within the authority Congress conferred, which courts decide independently. *Loper Bright,* 603 U.S. at 412-13.

Nor do those arguments bear on accrual. As noted *supra*, Section III.A, the certainty that a well will someday require plugging does not mean the obligation has already accrued. Otherwise, every foreseeable lease obligation—rentals, royalties, reclamation, and plugging—would be "accrued" before assignment, leaving nothing to "thereafter accru[e]" and rendering Section 187a's release meaningless.

Likewise, the fact that a prior lessee benefited from production cannot justify imposing continuing liability absent statutory authorization. When Congress intends to impose liability on former owners or operators, it says so expressly. Pet. Br. at 34-35. Congress did not do so in the MLA.

Intervenors' state law authorities underscore that point because they impose predecessor liability by statute. ECF 73 at 12-14. Those enactments show only that legislatures know how to create such liability when they choose. And the analogous

offshore regulation, 30 C.F.R. § 250.1701(a), does not interpret or implement Section 187a.

Nor can Respondents salvage the rule by characterizing it as a mere clarification of longstanding practice. Before 2001, BLM's regulations provided that, upon approval, "the transferee and its surety shall be responsible for the performance of all lease obligations." 43 C.F.R. § 3106.7-2 (1988). Accordingly, pre-2001 IBLA decisions recognized that approval terminated the assignor's bond liability. *Karis Oil Co.*, 58 IBLA at 124-25; *R.E. Puckett,* 124 IBLA at 292.

The administrative record confirms that the 2001 Rule changed the prior regime. Industry commenters uniformly argued that Section 187a released assignors from post-assignment liabilities and objected that BLM lacked authority to impose continuing liability by regulation. Pet. Br. at 8. Rather than identify any statutory basis for the new rule, BLM invoked policy—responding that it was "prudent to reserve our rights." RUL0015. The Department's 1995 Bonding Review likewise acknowledged substantial uncertainty under the existing statute and regulations, noting that one could reasonably infer assignors were not responsible for obligations arising after approval of an assignment. ECF 74-2 at RUL0807.

## IV. BLM'S ENFORCEMENT AGAINST PONDEROSA WAS ARBITRARY, CAPRICIOUS, AND BASED ON THE WRONG REGULATION.

Even if the Court upholds 43 C.F.R. § 3106.7-2(b) and its successor regulation, BLM's enforcement against Ponderosa must still be set aside.

BLM imposed over $800,000 in civil penalties against Ponderosa based on its determination that Ponderosa was liable "in accordance with 43 C.F.R. § 3106.7-6(a)." SDR0406. That regulation governs the obligations assumed by the current lessee or assignee; it does not impose continuing liability on a former lessee after approval of an assignment. Pet. Br. at 40.

Respondents now argue that BLM "should also have cited" Section 3106.7-2(b) and characterize the omission as a drafting error. ECF 75 at 46. But the SDR decision did not merely omit a citation. It quoted and relied upon Section 3106.7-6(a)'s substantive language. SDR0406. The Court must evaluate the agency's action on the grounds the agency invoked, not on post hoc rationalizations. *SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947); *Motor Vehicle Mfrs Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983); *Michigan v. EPA*, 576 U.S. 743, 758 (2015). Substituting Section 3106.7-2(b) for Section 3106.7-6(a) would supply an entirely different legal basis for the agency's action.[3]

---

[3] The "less than ideal clarity" standard cited by Respondents, ECF 75 at 46, does not help them. That standard permits a court to discern an agency's path when its stated

BLM's handling of Ponderosa's compromise requests provides a separate basis for reversal. Ponderosa submitted requests authorized by statute and regulation, yet BLM dismissed one as moot and failed to address the other. SUP0090; SDR0404-07. Ponderosa does not ask the Court to second-guess the outcome of any compromise determination, but rather to find error in BLM's refusal even to consider the requests. An agency cannot properly exercise discretion by refusing to exercise it. *See Scarabin v. Drug Enf't Admin*., 919 F.2d 337, 338–39 (5th Cir. 1990); *In re Sixty Seven Thousand Four Hundred Seventy Dollars ($67,470.00)*, 901 F.2d 1540, 1544 (11th Cir. 1990); *Cotonificio Bustese, S.A. v. Morgenthau*, 121 F.2d 884, 888 (D.C. Cir. 1941).

Finally, BLM's own 1995 Bonding Review recognized that plugging costs frequently exceeded bond amounts and identified assignment approval as a critical point for reassessing financial assurance. ECF 74-2 at RUL0679. Yet nothing in the record indicates BLM reviewed bonding requirements as ownership changed. Instead, after releasing Ponderosa's bond, BLM sought to transfer the shortfall back to Ponderosa.[4] Nothing in the MLA permits BLM to cure its own bonding decisions

---

reasoning is imperfectly expressed; it does not permit the court to supply a regulation the agency did not invoke in place of one it did. *See State Farm*, 463 U.S. at 43, 50.

[4] Alan O'Hare's employment by a successor, ECF 75 at 16-17, is irrelevant to Ponderosa's liability. Moreover, Mr. O'Hare had terminated his relationship with Wind River Hydrocarbons in October 2016, long before BLM commenced

by imposing liability on an assignor after approving the assignment and releasing the assignor's bond.

## V. PONDEROSA'S CLAIMS ARE TIMELY.

### A. Section 226-2 Does Not Apply.

The Federal Respondents argue that many of Ponderosa's claims are time-barred under 30 U.S.C. § 226-2. ECF 75 at 23-29. That argument fails for two independent reasons. Section 226-2 applies only to actions "contesting a decision of the Secretary involving any oil and gas lease," and was enacted to "remove a potential cloud on acreage subject to leasing." S. Rep. No. 86-1549, at 5, reprinted in 1960 U.S.C.C.A.N. 3313, 3317 (June 10, 1960). The text of 30 U.S.C. § 226-2 as enacted provides:

> No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.

P.L. 86-705, 74 Stat. 781, 790 (Sept. 2, 1960).

First, Ponderosa does not contest a decision "involving" an oil and gas lease. The question is whether Section 187a permits BLM to treat a plugging obligation as having "accrued" to an assignor years before the well ceased producing and years after BLM approved the assignment. That is an APA question of statutory

---

enforcement action against Adcore/Wind River. *Compare* Ex. 1, Resignation of A. O'Hare, *with* SDR0104; SUP0007.

interpretation concerning predecessor liability under the MLA, not a challenge to any decision involving a lease.

Second, and independently, no lease existed when BLM issued the challenged decisions. BLM determined that Lease No. WYW140314 expired on October 14, 2018, and its records describe the lease as closed. SDR0397-98. The enforcement orders challenged here were issued years later, in 2024. Because no federal oil and gas lease was in effect when BLM acted, the agency's decisions could not "involve" a lease within the ordinary meaning of Section 226-2.

The Tenth Circuit has accordingly held that Section 226-2 applies only to challenges to "lease issuance or substantive decisions relating to the lease itself." *Park Cnty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 616 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). This Court has declined to extend Section 226-2 further, characterizing *Park County*'s comment that the statute covers challenges to compliance with the MLA's leasing provisions as "rather broad dicta." *Wyoming v. U.S. Dep't of the Interior*, No. 22-CV-247-SWS, 2024 WL 5264647, at *10 (D. Wyo. Dec. 31, 2024). As this Court explained, "Congress was capable of saying the statute applies to claims challenging a lack of MLA compliance if it so desired. Instead, though, Congress limited the statute's application to decisions 'involving any oil and gas lease.'" *Id.* at *9. Because there were no leases in

existence, the BLM decisions challenged in *Wyoming* did not "involve" an oil and gas lease, and Section 226-2 did not apply. *Id.* at *10.

The District of Montana recently applied the same reasoning, holding that Section 226-2 "means what it says" and does not apply to BLM decisions made when "there was no federal oil and gas lease in effect at the time." *Phoenix Energy One, LLC v. Kraken Oil & Gas, LLC*, No. CV 25-65-BLG-TJC, 2026 WL 2390834, at *6, *7 (D. Mont. Aug. 17, 2026).

Under either rationale, Section 226-2 does not apply. Ponderosa's challenge is therefore governed by the six-year limitation period for APA claims, 28 U.S.C. § 2401(a), which runs from the date of injury. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 825 (2024). Ponderosa commenced this action on Monday, July 22, 2024, within 90 days from the date BLM claims it delivered its SDR decision to Ponderosa on April 22, 2024, SUPP0253; SDR0404, and within weeks of receiving BLM's June 27, 2024, civil penalty order.

### B. Even if Section 226-2 Applies, This Action is Timely Because BLM's Civil Penalty Order was the Final Agency Action Related to the Matter

Even if 30 U.S.C. § 226-2 applies, Ponderosa's claims are timely because the agency's decision-making process did not culminate, and Ponderosa suffered no cognizable injury, until BLM imposed $800,580 in civil penalties on June 27, 2024. CPL0001, CPL0022-23.

A claim challenging agency action does not accrue until the plaintiff is injured by final agency action. *Corner Post*, 603 U.S. at 804, 825. Only final agency action is subject to judicial review. *Id.* at 808; 5 U.S.C. § 704; 30 U.S.C. § 1719(j). Under *Bennett v. Spear*, agency action is final only when it (1) marks the consummation of the agency's decision-making process and (2) determines rights or obligations or gives rise to legal consequences. 520 U.S. 154, 177-78 (1997).

Consistent with *Bennett,* courts have held that finality occurs when the agency completes the penalty phase and fixes the monetary consequences of its decision, not when it issues the predicate violation determination. *See, e.g., United States v. Meyer,* 808 F.2d 912, 914, 922 (1st Cir. 1987) (limitation period under 28 U.S.C. § 2462 triggered on the date penalty is imposed, not the date of predicate violation); *Statoil USA E&P Inc. v. U.S. Dep't of the Interior*, 2017 WL 7053924, at *7-8 (S.D. Tex. Sept. 29, 2017) (finding no finality under 30 U.S.C. § 1719(j) because no final order had been issued on the penalty assessment); *SEC v. Mohn,* 465 F.3d 647, 654 (6th Cir. 2006) (administrative order on liability held not final until issuance of order affirming sanctions); *FERC v. Vitol Inc.*, 79 F.4th 1059, 1063 (9th Cir. 2023) (limitations period does not begin until the agency has "assessed a civil penalty"); *United States v. I-44 Truck Ctr. & and Wrecker Serv., LLC*, 180 F.4th 1091, 1097

(8th Cir. 2026) (statute of limitation "started to run when the penalties became final orders").[5]

BLM's enforcement regime is a single, escalating process. A compliance order provides notice of alleged noncompliance; only later are civil penalties imposed. See 43 C.F.R. §§ 3163.1-.2. Until the penalty stage is completed, the agency has not definitively fixed the regulated party's liability.

Here, BLM's April 18, 2024, SDR decision concluded Ponderosa was responsible for plugging the Day Butte well, directed Ponderosa to submit a notice of intent to do so, and lifted the stay of enforcement action. SDR0406. At that point, Ponderosa faced only a compliance directive and a contingent threat of future penalties in the event it failed to comply. BLM expressly represented that penalties could be avoided through compliance. SDR0291-92. *See also* ECF 75 at 49 (Ponderosa "would ultimately face civil penalties"). BLM's enforcement proceeding did not culminate until its June 27, 2024, civil penalty order. CPL0022-23 ("Your failure to correct the violation identified has resulted in the full civil penalty amount that is due and payable.") Only then did BLM fix Ponderosa's

[5] Unlike the compliance order in *Sackett v. EPA,* 566 U.S. 120 (2012), which required immediate action and precluded development permits, and was deemed action for which there was no adequate remedy other than APA judicial review and therefore a final order, the SDR decision here only directed Ponderosa to file a notice of intent. It did not order or compel operations or finally assess penalties, and Ponderosa could not have commenced plugging the well without further BLM approval. 43 C.F.R. §§ 3162.3-4(a), 3171.25(a).

liability at $800,580 and demand payment. *Id.*; CPL0001. That order marked the consummation of the agency's enforcement process and inflicted the concrete monetary injury prompting this suit. Section 226-2 reinforces this conclusion. The statute runs from the "final decision of the Secretary relating to such matter" and there was no such *final* decision until the June 27, 2024, order.

Respondent's reliance on *Impact Energy Resources, LLC v. Salazar*, 693 F.3d 1239 (10th Cir. 2012) is misplaced. *Impact Energy* involved a final decision of the Secretary himself, from which no administrative appeal could be taken. *See* 43 C.F.R. § 4.5. It was not a civil-penalty proceeding and produced no majority rationale defining a "final decision" under Section 226-2.[6] Two judges on the three-judge panel, however, opined that the "final decision" of the Secretary under Section 226-2 means the same thing as "final agency action" under the APA—that is, it meets the *Bennett* test. 693 F.3d at 1241; *see also id.* at 1254 (Seymour, J., concurring) and at 1260 (Tymkovich, J., dissenting).

A party should not be forced to seek judicial review before the full scope of its liability is known and the agency has finished its decision-making process. Thus, the statute of limitation does not begin to run until agency action is "final" and the

[6] The panel in *Impact Energy* produced three separate opinions and none carries binding precedential effect on the finality question. *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 940 F.3d 498, 504, 510-511 (10th Cir. 2019); *United States v. Carrizales-Toledo,* 454 F.3d 1142, 1151 (10th Cir. 2006).

party has been injured by it. *See Crown Coat Front Co. v. United States*, 386 U.S. 503, 511-14 (1967). The SDR decision, which directed Ponderosa to file a notice of intent for BLM's approval and lifted the stay on further enforcement action, SDR0406, neither fixed a penalty amount nor marked the "consummation" of the agency's decision-making process. *Bennett v. Spear,* 520 U.S. at 178. Ponderosa filed this action less than 30 days after the June 27, 2024, penalty order.

### C. Even if Section 226-2 Applies to the SDR Decision, This Action is Timely

If the SDR decision and civil penalty order are independently subject to review, and Section 226-2 applies, Ponderosa's action also is timely as to the former. BLM asserts that it delivered its April 18, 2024, SDR decision to Ponderosa's counsel on April 22, 2024; Ponderosa's counsel did not actually receive it until June 27, 2024. Ex. 2, Declaration of Danielle DiMauro. Either way, Ponderosa's right to challenge the SDR decision could not accrue before April 22, 2024, the earliest date it could have known of the decision. Ponderosa filed this action on Monday, July 22, 2024—within the 90-day period from BLM's claimed delivery date.[7]

Moreover, the SDR decision did not become "final" for purposes of judicial review under the APA until May 23, 2024, once the pertinent appeal period had

[7] Fed. R. Civ. P. 6 extends a deadline that falls on a Sunday to the next day.

elapsed.[8] *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1064 (9th Cir. 2010) ("barring a petition for a stay, a decision will become effective upon the expiration of the appeal period"); *id.* at 1065 ("[I]n some cases, a Record of Decision may constitute final agency action. For example, where there is no administrative appeal, a Record of Decision will become effective and final following the expiration of the appeal period, in accordance with 43 C.F.R. § 4.21(a)(2).)"[9]

The Department's 2024 regulations defined when decisions were "final" for purposes of APA review. Specifically, "[e]xcept as otherwise provided by law or other pertinent regulation," a decision "will not be effective during the time in which a person adversely affected may file a notice of appeal" and it "will become effective on the day after the expiration of the time during which a person adversely affected may file a notice of appeal unless a petition for a stay pending appeal is filed." 43 C.F.R. § 4.21(a) (2024). Further, "[n]o decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704," with certain exceptions not pertinent here. *Id.* § 4.21(c) (2024).

---

[8] When Congress adopted Section 226-2 in 1960, no statute other than the APA provided for judicial review of lease-related decisions. Section 226-2 specified a time limit for challenges, but offered no further definition of finality beyond that supplied by the APA.

[9] The text of 43 C.F.R. § 4.21 was identical in 2010 and 2024.

As a decision cannot feasibly be appealed at the instant of its "rendition," the phrase "subject to appeal" meant "may be appealed." And if the Department had intended to make the decision inoperative only in the event of a *pending* appeal, it could have said "subject to **an** appeal **before** the Director or an Appeals Board." It did not.

Thus, a Departmental decision is not "final" until the 30-day appeal period has elapsed without a notice of appeal, or until the conclusion of any further administrative review. *See Geosearch, Inc. v. Andrus,* 494 F. Supp. 978, 979-80 (D. Wyo. 1980) (90-day appeal period started when IBLA decision was final). BLM's SDR decision dated April 18, 2024, was subject to a 30-day appeal period that ran from the date of receipt. 43 C.F.R. § 4.411(a)(2)(i) (2024); SDR0406. Therefore, assuming delivery on April 22, 2024, the decision could not have been a "final decision of the Secretary" until, at the earliest, May 23, 2024, when the decision was no longer "subject to appeal." If the 90-day period under Section 226-2 applies to the SDR decision, it began to run no earlier than that date. Ponderosa's action was timely.

Nor did the 2024 regulations require Ponderosa to appeal either the SDR decision or the penalty order to preserve judicial review; exhaustion was then not a prerequisite for most BLM decisions. Only in 2025 did the Department's Office of Hearings and Appeals revise its regulations to require such exhaustion before

judicial review. 90 Fed. Reg. 2332, 2340 (Jan. 10, 2025) (citing *Darby v. Cisneros*, 509 U.S. 137, 152 (1993)).

### D. In Any Event, A Timely Challenge to the Civil Penalty Order Permits Review of the Predicate Liability Determination and the Seventh Amendment Claim.

Regardless of whether the SDR decision was independently final, Ponderosa's challenge to the June 27, 2024, civil penalty order is timely and permits review of the underlying liability determination and the regulation on which the penalty rests.

The penalty order did not arise independently. BLM imposed penalties solely because it concluded that Ponderosa remained responsible for plugging a well years after assigning away all lease interests. SDR0207-12, SDR0404-07; CPL0022-23. The liability determination is the indispensable legal foundation for the agency's monetary sanction. The validity of the penalty therefore rises or falls with the validity of that determination and its regulatory underpinning.

Respondents effectively concede as much, acknowledging that Ponderosa may challenge the regulation's validity in an otherwise proper challenge to a final agency action applying it. ECF 75 at 29. That is exactly what this case presents. A civil penalty order is paradigmatic agency action applying a regulation to a specific party and causing concrete injury. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891, 894 (1990); *Bennett*, 520 U.S. at 177-78.

Courts have long distinguished between direct review of a rule and review of the rule when later applied in an enforcement action. Unless Congress clearly provides otherwise, a party may challenge the statutory validity of a regulation when the agency seeks to enforce it. *See Functional Music, Inc. v. FCC,* 274 F.2d 543, 546 (D.C. Cir. 1958); *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014).

Recent Supreme Court decisions reinforce that conclusion. *Corner Post* held that APA claims accrue when a plaintiff suffers injury from agency action, not merely when a rule is promulgated. 603 U.S. at 825. And absent a statute expressly precluding judicial review in enforcement proceedings, "a district court must independently determine for itself whether the agency's interpretation of a statute is correct." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155-157 (2025). Nothing in Section 226-2 forecloses such review.

Likewise, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflects the Court's insistence that parties generally remain entitled to meaningful judicial review of agency action absent a clear congressional command to the contrary. Section 226-2 contains no such command.

Respondents' position to the contrary rests on a premise that modern Supreme Court precedent has repeatedly rejected: that the 90-day period in Section 226-2 operates as an absolute jurisdictional bar insulating an agency liability determination

from any subsequent judicial scrutiny. See ECF 75 at 26 (asserting "the MLA's statute of limitations is jurisdictional") and 24 n. 6. This premise finds little support in the statutory text, and the decision Respondents cite, *United States v. Wong*, 575 U.S. 402, 408-09 (2015), shows just the opposite.

In *Wong,* the Supreme Court stated, "most time bars are nonjurisdictional" even when framed in "mandatory terms." 575 U.S. at 410. It ruled the government must "clear a high bar to establish that a statute of limitations is jurisdictional," noting, in "recent years, we have repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has 'clearly state[d]' as much." *Id.* at 409-410 (citations omitted) (alteration in original). It further held "Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional." *Id.* at 410.

Section 226-2's deadline is directed at litigants, not courts; it does not mention jurisdiction; and it is separate from the jurisdictional grant in 28 U.S.C. § 1331. "Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional." *Wong,* 575 U.S. at 411; *see also Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206-07 (2022) (requiring clear statement linking jurisdictional grant to a filing deadline). Under the Supreme Court's modern framework, the language in Section 226-2 is as an ordinary claims processing rule, not a jurisdictional bar. *See Wilkins v. United States,* 598 U.S. 152,

158-59 (2023) (time limitation in Quiet Title Act held non-jurisdictional, abrogating contrary holding of *Kane County, Utah v. United States,* 772 F.3d 1205 (10th Cir. 2014)).

*Impact Energy*, which held that Section 226-2's limitation period generally runs from the date the Secretary issues a final decision, did not establish what constitutes a "final decision" of the Secretary or hold that Section 226-2 is jurisdictional. 693 F.3d at 1241. And it did not address whether a party that timely seeks review of a civil penalty assessment may challenge the validity of the predicate liability determination.

*Impact Energy* preceded *Boechler, Wilkins*, *Corner Post*, *Axon, and McLaughlin,* all of which emphasize preserving meaningful judicial review. The Court should hold that Section 226-2 does not bar Ponderosa from challenging the validity of the April 18, 2024, SDR decision as a defense to the substantial civil penalties assessed on June 27, 2024.

Neither Federal Respondents nor Intervenors have asserted that Ponderosa failed to exhaust its administrative remedies, so the issue is waived. In any event, 30 U.S.C. § 1719(e) and (j) do not constrain review of the penalty order. Section 1719 allows a hearing on the record before penalties are imposed and, where a party requests one, confines district-court review of the Secretary's final order to the administrative record. 30 U.S.C. § 1719(e), (j). The statute does not make a hearing

a precondition to judicial review or limit de novo review where no hearing was requested or a hearing would be futile. Even if the permissive statutory text were "ambiguous as to whether it precludes judicial review of an agency interpretation in enforcement proceedings, ambiguity does not suffice to deprive a party of judicial review." *McLaughlin*, 606 U.S. at 162. And absent a clear statement, the statute is nonjurisdictional and subject to waiver. *See Chissoe v. Zinke*, 725 F. App'x 614, 621 (10th Cir. 2018).

Regardless, Ponderosa would not be required to pursue administrative review when its claims are not "'of the type' Congress thought belonged within a statutory scheme" for such review. *Axon*, 598 U.S. at 188-89. A challenge to BLM's authority to enact a regulation imposing perpetual liability on predecessor lessees, and the constitutionality of the imposition of that penalty without a jury, are not the type of claim Congress entrusted to BLM when it created the opportunity for a hearing in 30 U.S.C. § 1719(e).

A "statutory review scheme" that vests agencies with authority to review their own actions "does not necessarily extend to every claim concerning agency action." *Axon*, 598 U.S. at 185 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212, (1994)). The Supreme Court applies a three-factor test from *Thunder Basin* to determine whether a district court was divested of jurisdiction pending completion of agency review. *Id.* at 186-196. All three factors need not be satisfied. *See id.* at

186 (jurisdiction may follow even "if the factors point in different directions"); *Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015) (factors are "general guideposts," not "a strict mathematical formula").

Pertinent here, the first factor, "whether preclusion of district court jurisdiction 'could foreclose all meaningful judicial review'" is implicated by a "here-and-now injury"—such as being subjected to an illegitimate enforcement proceeding—that cannot be remedied once the administrative proceeding ends. *Axon*, 598 U.S. at 190, 191. Ponderosa would suffer such an injury if it were required to pursue all administrative remedies before it could obtain judicial review of the predicate regulation and the constitutionality of the penalty process.

Second, the claims are "wholly collateral" to the administrative review provisions of the statute. Ponderosa asserts that BLM's regulation exceeds the authority granted by Congress, and that imposition of the penalty violated the Seventh Amendment. Ponderosa's claims, like the "separation-of-powers claims" at issue in *Axon*, "do not relate to the subject of the enforcement actions" nor do they "address the sorts of procedural or evidentiary matters an agency often resolves." *Id.* at 193.

Third, Ponderosa's claims "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy'" and as such, are outside the agency's "competence and expertise." *Id.* at 194 (quoting *Free*

*Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010)). Neither BLM nor the IBLA "know[] [any]thing special about the separation of powers." *Id.* (further observing, "'agency adjudications are generally ill suited to address structural constitutional challenges'") (quoting *Carr v. Saul*, 593 U.S. 83, 92 (2021)).

## VI. THE SEVENTH AMENDMENT BARS BLM'S ADMINISTRATIVE IMPOSITION OF CIVIL PENALTIES.

The Federal Respondents characterize BLM's penalty as equitable because it enforced a plugging obligation and as "coercive" because it was initially purgeable. ECF 75 at 48-51. Both arguments fail, and the public-rights exception does not apply.

The remedy here is not plugging a well; it is payment of $800,580. CPL0001; CPL0022-23. A monetary remedy is legal when it is "designed to punish or deter the wrongdoer" rather than "solely to 'restore the status quo.'" *SEC v. Jarkesy*, 603 U.S. 109, 123 (2024) (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)). BLM's penalty does not compensate any injured party and is not measured by any loss. CPL0022-23. It serves only to punish, which makes it a legal remedy. *Jarkesy*, 603 U.S. at 124.

Nor does the penalty become equitable because compliance initially could have prevented its accrual. The contempt cases cited by Respondents, ECF 75 at 49-50, address whether sanctions are civil or criminal for contempt purposes, not

whether a remedy is legal or equitable under the Seventh Amendment. A sanction can be avoidable through compliance and still be a legal remedy. Indeed, *Tull* itself involved a substantial fine that the defendant could have avoided by restoring the affected waterway, yet the defendant there was entitled to a jury. 481 U.S. at 415-16, 425. As the Supreme Court later explained, the ability to avoid a sanction by obeying a legal command is "indistinguishable from the ability of any ordinary citizen to avoid a criminal sanction by conforming his behavior to the law." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 837 (1994).

In any event, the penalty BLM imposed was not purgeable. When the April 8, 2024, abatement date passed, the daily rate rose tenfold, "reverting to the beginning date of 28 February 2024." SDR0291-92. BLM's June 27, 2024, order then declared "the full civil penalty amount" of $800,580 "due and payable," with no opportunity to eliminate or reduce the penalty through later compliance. CPL0022-23. A "fixed, determinate, retrospective" fine for past conduct is punitive. *Bagwell*, 512 U.S. at 829, 837. Respondents contend that the escalation is coercive and that BLM faces a $300,000 loss. ECF 75 at 50-51. But the penalty tracks days of noncompliance, not loss, and $800,580 is more than two and one-half times the plugging estimate Respondents invoke. *Id*. at 51. And Respondents' unsupported assertion that BLM has waived penalties for others changes nothing. *Id.* at 50. An unofficial practice

of forgiving some penalties does not transform a fixed monetary obligation into an equitable remedy.

The Respondents' remaining arguments fare no better. Their reliance on *McElrath v. United States,* 102 U.S. 426 (1880), is misplaced because that case concerned suits against the sovereign following a waiver of sovereign immunity. This case involves the opposite circumstance: the government imposed a civil penalty on a private party. The Supreme Court has unequivocally held that such penalties are legal remedies subject to the Seventh Amendment. *Tull*, 481 U.S. at 418-25; *Jarkesy*, 603 U.S. at 123-25. That Ponderosa petitioned for review changes nothing. So did the respondents in *Jarkesy*. 603 U.S. at 119.

The public-rights exception also does not apply. *Jarkesy* mentioned "the administration of public lands" only in a list drawn from *Crowell v. Benson*, 285 U.S. 22, 51 (1932) and cautioned that "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." 603 U.S. at 130, 132. What matters is the substance of the claim, and civil penalties are "a type of remedy at common law that could only be enforced in courts of law." *Id.* at 125 (quoting *Tull,* 481 U.S. at 422). Congress cannot "conjure away the Seventh Amendment" merely by assigning such claims to an agency. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 52 (1989).

Respondents argue in the alternative that "leases dispose of interests in public lands." ECF 75 at 53. But any disposition occurred when the lease was issued in 1996. The lease expired in 2018, and BLM is not issuing, cancelling, or forfeiting anything. SDR0397-98. Respondents' reliance on *Burfenning* is likewise misplaced. *Burfenning v. Chi., St. P., M. & O. Ry. Co.* concerns the land department's factfinding in deciding who takes title to public land. 163 U.S. 321, 323 (1896). It does not address a monetary penalty imposed on a former lessee years after its interest ended. *See id.*

Finally, Respondents' claims that Ponderosa identifies no "triable jury issue," ECF 75 at 51, and that jury trials would throw the federal oil and gas program into "disarray," *id.* at 54, both overlook that the jury decides only liability and the court fixes the amount. *Tull*, 481 U.S. at 425-27.

*FCC v. AT&T, Inc.*, 608 U.S. 531 (2026), highlights the constitutional defect here. There, the Court sustained the FCC's forfeiture regime because the agency's order did not itself establish an obligation to pay; the government was required to prove its case de novo in federal court before a jury. *Id.* at 540-43. BLM's regime operates differently. BLM fixed Ponderosa's liability at $800,580 and demanded payment, offering only administrative review, and would have limited judicial review to the administrative record. CPL0001; CPL0022-23; 30 U.S.C. § 1719(j). Unless this Court sets aside the order, no jury will ever determine Ponderosa's

liability. BLM, like the FCC, may seek a penalty in federal court, where a jury decides liability, but it may not impose one on its own authority.

## VII. CONCLUSION

The Court should vacate the 2001 and 2024 Rules and set aside BLM's liability determination and penalty order against Ponderosa.

Respectfully submitted this 12th day of November, 2026.

*/s/ Danielle DiMauro*
Danielle DiMauro (pro hac vice)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
1401 Lawrence Street, Suite 1800
Denver, Colorado 80202
Telephone: 303-830-2500
ddimauro@wsmtlaw.com

Hampton K. O'Neill (Wyoming Bar No. 5-2876)
WELBORN SULLIVAN MECK & TOOLEY, P.C.
159 North Wolcott, Suite 220
Casper, Wyoming 82601
Telephone: 307-234-6907
honeill@wsmtlaw.com

*Attorneys for Petitioner Ponderosa Resources Corporation*

## CERTIFICATE OF COMPLIANCE

This document complies with the Court's order dated October 23, 2026 (ECF 77), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 8,942 words, as determined by the word-count function of Microsoft Word.

*<u>/s/ Danielle DiMauro</u>*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Danielle DiMauro*